IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ANGELA AMES, | Case No. 4:11-cv-00359 |
| Plaintiff, | |
| v. | |
| NATIONWIDE MUTUAL INSURANCE CO., NATIONWIDE ADVANTAGE MORTGAGE CO., and KARLA NEEL, | PLAINTIFF'S BRIEF IN SUPPORT OF HER RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| Defendants. | |

COMES NOW the Plaintiff and submits her Brief in Resistance to Defendants' Motion
for Summary Judgment.

## TABLE OF CONTENTS                                    PAGE

INTRODUCTION ...............................................................................................................2

I.      SUMMARY OF THE FACTS............................................................................................2

II.     LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS ...............................7

III.    A REASONABLE JURY CAN FIND THAT DEFENDANTS VIOLATED
        THE FAIR LABOR STANDARDS ACT .......................................................................10

        A.      THE FAIR LABOR STANDARDS ACT PROVIDES PLAINTIFF
                WITH A PRIVATE RIGHT OF ACTION AND ALLOWS FOR THE
                RECOVERY OF DAMAGES .............................................................................10

        B.      DEFENDANTS VIOLATED 29 U.S.C.207(r) ....................................................12

IV.     A REASONABLE JURY CAN FIND THAT DEFENDANTS DISCRIMINATED
        AGAINST PLAINTIFF ON THE BASIS OF HER SEX AND PREGNANCY .............14

        A.      PLAINTIFF HAS DIRECT EVIDENCE OF DISCRIMINATION.....................14

        B.      PLAINTIFF CAN ALSO PROVE HER CASE VIA THE
                INDIRECT METHOD..........................................................................................17

      1.      PLAINTIFF WAS A MEMBER OF A PROTECTED GROUP ...............17

      2.      A REASONABLE JURY COULD FIND DEFENDANTS CONSTRUCTIVELY DISCHARGED PLAINTIFF ...............................23

      3.      A REASONABLE JURY COULD FIND THAT THE CIRCUMSTANCES SURROUNDING PLAINTIFF'S CONSTRUCTIVE DISCHARGE PERMIT AN INFERENCE OF DISCRIMINATION .................................................................................30

V.     IT WOULD BE IMPROPER FOR THE COURT TO GRANT SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES UNDER TITLE VII ....................................................................................................................31

VI.    IT WOULD BE IMPROPER FOR THE COURT TO GRANT SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES OR LIQUIDATED DAMAGES UNDER THE FLSA ...........................................................32

CONCLUSION   .......................................................................................................................33

<u>**INTRODUCTION**</u>

      Defendants claim that Angela Ames cannot show a material fact exists as to whether Defendants violated the Break Time for Nursing Mothers provision of the FLSA and discriminated against her on the basis of her sex and pregnancy. However, the record is rife with numerous contradictions and vastly conflicting factual testimony. Like most employment law matters in which individuals' motives are at issue, the outcome of the case rests on credibility determinations and the inferences that will be drawn from the facts. These are determinations that must be left to the sound discretion of members of the jury, who are uniquely qualified to judge them.

**I.**    **SUMMARY OF THE FACTS**

      Plaintiff Angela Ames began working at Nationwide as a Loss Mitigation Representative in October 2008. (Ames Dep. 42) (P. App. 2). She had her first child on May 2, 2009, and took 8 weeks of maternity leave following his birth. (Ames Dep. 63) (P. App. 3); (Ames Aff. ¶ 1) (P.

2

App. 90). Angela returned from maternity leave in July 2009 and found out that she was pregnant again in October 2009. (Ames Dep. 63-65) (P. App. 3-4). She immediately notified Nationwide of her pregnancy. (Ames Dep. 63-65) (P. App. 3-4).

Angela started going into pre-term labor approximately 20 weeks into her second pregnancy. (Ames Aff. ¶ 2) (P. App. 90). Because her contractions were only occurring at work, Angela's doctor put her on bed rest beginning on April 11, 2010. (Neel Dep. 56) (P. App. 36); (Ames Aff. ¶ 3) (P. App. 90). When Angela discussed needing to go on bed rest with Karla Neel, the head of her department, Ms. Neel disgustedly rolled her eyes and told Angela that *she* never had to go on bed rest when she was pregnant and that *she* never had complications with her pregnancies. (Neel Dep. 51-54) (P. App. 35); (Ames Dep. 85, 89) (D. App. 88, 92). Ms. Neel pointedly told Angela that when *she* was pregnant, all she ever needed was a "pack of Tums and [she] was good to go." (Ames Dep. 89) (D. App. 92); (Neel Dep. 51-52) (P. App. 35). Ms. Neel had previously shared with Angela that she did not think that anyone should be entitled to a baby shower while she is still pregnant because the baby could die in utero. (Neel Dep. 110-11) (P. App. 39-40); (Ames Dep. 86, 89) (D. App. 89, 92). Both Brian Brincks and Karla Neel told Angela that she could only have one week off after she delivered her second child because she had already used her eight weeks of maternity leave after her first pregnancy. (Ames Dep. 87-88) (D. App. 90-91).

Angela gave birth to her son prematurely on May 18, 2010—five weeks before his expected due date. (Ames Dep. 162) (P. App. 15); (Ames Aff. ¶ 4) (P. App. 90). After many discussions with her immediate supervisor, Brian Brinks, it was decided that Angela would be on leave until August 2, 2010. (TOPS email dated 6/2/10)(P. App. 88-89); (6/16/10 Audio Recording) (D. App. 204). While Angela was on maternity leave, Nationwide began training another employee, Angie Ebensberger, for Angela's job. (Ames Dep. 109-11) (P. App. 11).

At no point in time either during her pregnancy or her maternity leave did anyone ever encourage Angela to review any of Nationwide's policies regarding lactation or say anything to indicate that she needed to notify Nationwide in advance of her intent to pump. Ames Dep. 82, 90-93) (P. App. 7, 8-9); (Neel Dep. 19-20, 67-68) (P. App. 34, 37); (Brincks Dep. 19) (P. App. 20); (Hallberg Dep. 22) (D. App. 62). Even after Angela specifically asked Disability Case Manager Somphong Baccam where she would pump when she returned to work, Ms. Baccam still did not direct Angela to review the Lactation Program Policy or any other policies regarding lactation. (Baccam Dep. 10) (P. App. 17); (Ames Dep. 69) (D. App. 82).

Karla Neel called Angela on June 16, 2010, and told Angela that her short term disability leave ran out on July 13, 2010, and Angela was required to return to work on July 19, 2010—two weeks earlier than she had anticipated. (6/16/10 Audio Recording) (D. App. 204). During this telephone call, Ms. Neel told Angela that, although she technically could take additional time off until August 2 unpaid, that doing that "causes red flags," that she "[didn't] want there to be any problems like that," and that she "[didn't] want there to be any issues down the road." (6/16/10 Audio Recording) (D. App. 204). Angela sobbed during this conversation and had difficulty talking at times. (6/16/10 Audio Recording) (D. App. 204). Angela's distress was so obvious that Ms. Neel felt compelled to ask if she was "ok." (6/16/10 Audio Recording) (D. App. 204). Angela told Ms. Neel that she was "overwhelmed" and "not prepared" to return to work so soon. (6/16/10 Audio Recording) (D. App. 204). However, based on Ms. Neel's insinuation that she would be disciplined (if not fired) if she did not return to work on July 19, 2010, Angela asked Ms. Neel if her promise to return to work on July 19, 2010, would be sufficient to ensure that she was not disciplined or fired. (6/16/10 Audio Recording) (D. App. 204). Ms. Neel indicated that it was and the two agreed that Angela would return on July 19, 2010. (6/16/10 Audio Recording) (D. App. 204).

As directed, Angela returned to work on July 19, 2010. (Ames Dep. 69) (D. App. 82). She arrived at approximately 10:00 a.m. after taking her eight-week-old son to his well-baby check-up at the pediatrician. (Ames Dep. 69) (D. App. 82); (Bacon Dep. 41) (P. App. 18A); (Neel Dep. 75-76) (P. App. 38). Angela's son was breastfeeding every three hours, and the last time she had nursed him was at approximately 6:30 a.m. (Ames Dep. 68-69) (P. App. 4-5). Because Angela's son was born prematurely, he had to nurse more frequently than a full-term baby would have. (Ames Dep. 68-69) (P. App. 4-5). By the time Angela arrived at work on July 19, 2010, it had been more than three hours since the last time Angela's baby had nursed, and she was beginning to feel uncomfortable. (Ames Dep. 68-69) (P. App. 4-5). When Angela arrived at work that morning, she also noticed that Angie Ebensberger's belongings were at her workspace. (Ames Aff. ¶ 5) (P. App. 90).

Angela first asked Ms. Neel about getting a nursing room and she said that it was not her job to get Angela set up with a room. (Neel Dep. 76) (P.App. 38); (Ames Aff. ¶ 6) (P. App. 90);[1] (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). Angela then went to the security desk to find out what she needed to do to get a private room to express milk and was directed to see the company nurse. (Ames Aff. ¶ 7) (P. App. 90); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). Nurse Sara (Sagers) Hallberg informed Angela that Nationwide's policies required her to fill out paperwork to be placed on a list for the lactation rooms and that there would be a three-day waiting period while this paperwork was processed.

---

[1] During Plaintiff's Deposition, Defense counsel declined to elicit specific testimony from Angela regarding the events of July 19, 2010. Rather, Defense counsel merely asked Angela if her Answer to Interrogatory 8 was true and correct to the best of her belief. (Ames Dep. 79-80) (P. App. 6). Interrogatory 8 asked Angela to set forth each and every adverse employment action committed by Karla Neel, Brian Brincks, Somphong Baccam, and Sara (Sagers) Hallberg. In her Answer to Interrogatory 8, Angela detailed the events of July 19, 2010. (P. Ans. Interrogatory 8) (P. App. 41-43). During her deposition, Ms. Ames verified that her Answer to Interrogatory 8 is true to the best of her knowledge. (Ames. Dep. 80) (P. App. 6). However, because Defense counsel chose, in large part, not to ask Ms. Ames further questions regarding her account of the events of July 19, 2010, citations to this information in this document will reference Plaintiff's Affidavit.

(Ames Dep. 82, 84) (P. App. 7). Understandably concerned that Ms. Hallberg did not understand that she needed to express milk right then, Angela sternly told her, "I need to pump now." (Ames Aff. ¶ 8) (P. App. 90); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). Ms. Hallberg told Angela that she _might_ be able to use a sick room if she returned in 15 to 20 minutes because a sick person was currently using the room and security would soon be checking on them. (Ames Aff. ¶ 9) (P. App. 91); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). However, Ms. Hallberg discouraged Angela from pumping in a sick room because her milk could be exposed to illness. (Ames Dep. 81, 98) (D. App. 87, 95). Ms. Hallberg informed Angela that the lock on the sick room was broken, so if she wanted any semblance of privacy, she would need put a chair against the door and sit in it while she pumped, so that anyone trying to come in would strike Angela's chair with the door and hopefully be discouraged from entering. (Ames Aff. ¶ 10) (P. App. 91); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6).

By this time Angela was experiencing extreme discomfort and needed to pump, but since she had to wait 15 to 20 minutes to check on the room, Angela asked supervisor Brian Brinks if they could have a meeting to catch up on the status of her work. (Ames Aff. ¶ 11) (P. App. 91); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). During the meeting, Mr. Brinks told Angela that she had until August 1, 2010, to get caught up on everything that had not been done during her maternity leave or she would start receiving disciplinary actions. (Brincks Dep. 69-70; 78) (P. App. 25, 26); (Ames Aff. ¶ 12) (P. App. 91); (P. Ans. Interrogatory 8) (P. App. 41-43); (Ames Dep. 80) (P. App. 6). That was only two weeks. Angela knew she would need to work a great deal of overtime to get caught up, which in turn would mean more breaks in order to express breast milk, and then more time at the office to catch up.

As Angela's anxiety and the pain in her breasts continued to increase, she went to Department Head Karla Neel to see if she could be of any assistance in helping Angela find a place to express milk. (Ames Dep. 97-99, 155) (P. App. 10, 13). However, even after Angela explained her predicament, Ms. Neel refused to lift a finger to help. (Ames Dep. 97-99, 155) (P. App. 10, 13). Instead, Ms. Neel encouraged Angela to resign right then and there, handed her a pen and paper to put her resignation in writing, and told her to "Maybe you should just go home with your babies." (Ames Dep. 97-99, 155) (P. App. 10, 13). Ms. Neel even directed Angela what to write on the piece of paper in order to officially resign. (Ames Dep. 155) (P. App. 13). Reasonably believing that she had been left with no other real option, Angela complied and tendered her resignation as directed. (Ames Dep. 97-99, 155) (P. App. 10, 13).

## II.     LEGAL STANDARDS FOR SUMMARY JUDGMENT MOTIONS

"Summary rulings are the direct antithesis of the full and fair process found in an adversary proceeding." *Hillebrand v. M-Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir. 1987). This is especially true when <u>credibility and motive</u> are key issues. "The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment." *Melvin v. Car-Freshener Corp.*, 453 F.3d 1000, 1004 (8th Cir. 2006) (Lay, J., dissenting).

To be entitled to summary judgment, Defendants must prove there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56 (c); *see Woods v. DaimlerChrysler Corp.,* 409 F.3d 984, 990 (8th Cir. 2005). A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here the plaintiff, and give her the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

(1986); *Rifkin v. McDonnell Douglas Corp.,* 78 F.3d 1277, 1280 (8th Cir. 1996). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Webb v. St. Louis Post-Dispatch*, 51 F.3d 147, 148 (8th Cir. 1995).

Summary judgment is inappropriate when liability turns on disputed facts, as is the case in most employment law cases. *See Keathley v. Ameritech Corp.,* 187 F.3d 915, 919 (8th Cir. 1999); *Hindman v. Transkrit Corp.,* 145 F.3d 986, 990 (8th Cir. 1998). As the late Judge Lay opined,

> Too many courts in this circuit, both district and appellate, are utilizing summary judgment in cases where issues of fact remain. This is especially true in cases where witness credibility will be determinative. In these instances, a jury, not the courts, should ultimately decide whether the plaintiff has proven her case. Summary judgment should be the exception, not the rule. It is appropriate "*only . . . where it is quite clear what the truth is, . . . for the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.*"

*Melvin.,* 453 F.3d at 1003-04 (Lay, J., dissenting) (emphasis in original).

Despite these pronouncements, employment cases are being summarily dismissed on summary judgment at alarming rates. Many courts give lip-service to the well-established principles set forth above, but dismiss employment cases out of hand anyway—even when there are clear factual disputes. This disturbing trend has been noted:

> The federal courts' daily ritual of trial court grants and appellate court affirmances of summary judgment in employment discrimination cases across the land is increasingly troubling to me. I worry that the expanding use of summary judgment, particularly in federal employment discrimination litigation, raises the ominous specter of serious erosion of the "fundamental and sacred" right of trial by [the fact finder].

*Kampouris v. St. Louis Symphony Society*, 210 F.3d 845, 850 (8th Cir. 2000) (Bennett, J., dissenting).

In *Desert Palace v. Costa*, the United States Supreme Court held that courts cannot apply higher evidentiary standards in employment discrimination cases than in other types of cases. *Desert Palace v. Costa*, 539 U.S. 90, 99-101 (2003). The *Costa* decision particularly noted that it makes no sense for to apply higher evidentiary standards in a civil case than in a criminal case, where a person's life and liberty are on the line and where proof beyond a reasonable doubt is required. *Id.* at 100.

Because it contains genuine factual disputes determinative of Defendants' liability, this case must survive summary judgment and be decided by a jury. Indeed, Defendants' own witnesses agree that this case is rife with factual disputes that a jury must sort out:

> Q:      And do you understand that, in order for someone to determine who is in fact telling the truth or what happened in this case, credibility determinations will need to be made.
> A:      Yes.
>
> Q:      Okay. Does that make sense to you, that basically a jury would have to sit and hear your testimony and hear Angela's testimony and figure out and decide who's telling the truth about what happened during that meeting that day?
> A:      Yes.
>
> Q:      And that it would be up to a jury to decide if there was any discrimination on your part against Angela Ames.
> A:      Yes.
>         …
> Q:      And again, given that you're aware there's also documents and testimony that Angela Ames has given that contradicts yours, do you believe this is a dispute that needs to be settled by a jury?
> A:      Yes, I believe so.

(Brincks Dep. 91-93)(P. App. 28).

> Q:      And do you understand that throughout this litigation, Angela and you dispute or have difference of opinions as to have the facts have come out in this case.
> A:      Yes.
>
> Q:      In fact, you dispute—you, in many cases, although in some cases there are agreements as to things that were said and done, there are multiple differences where Angela alleges you said something and you deny that that was said, correct?

| A: | Yes. |
| | … |
| Q: | And do you understand that that's a situation where credibility determinations will be needing to be made. Do you understand that? |
| A: | Okay. Yes. |
| | |
| Q: | And when I say that, what I mean is that a jury will listen to what Angela has to say, and then listen to what you have to say, and have to decide who's telling the truth in this case. |
| A: | Yes. |

(Neel Dep. 113-14) (P. App. 40).

This is one issue where Plaintiff, Ms. Neel, and Mr. Brincks see eye-to-eye—this case must proceed to be decided by a jury. Ms. Ames must be allowed her day in court.

## III. A REASONABLE JURY CAN FIND THAT DEFENDANTS VIOLATED THE FAIR LABOR STANDARDS ACT

### A. THE FAIR LABOR STANDARDS ACT PROVIDES PLAINTIFF WITH A PRIVATE RIGHT OF ACTION AND ALLOWS FOR THE RECOVERY OF DAMAGES

Section 4207 of the Patient Protection and Affordable Care Act has been codified as 29 U.S.C. 207(r)(1)-(4), an amendment to the Fair Labor Standards Act. This statute requires covered employers to provide a "place, other than a bathroom, that is shielded from view and free from intrusion from co-workers and the public, which may be used by an employee to express breastmilk." The Department of Labor has not yet issued final guidance on the enforcement of 29 U.S.C. 207(r)(1)-(4) and, at this point, the Department's enforcement of 29 U.S.C. 207(r)(1)-(4) is based on "the statutory language and the guidance provided in WHD Fact Sheet 73 and the associated FAQs." 75 Fed. Reg. 80073-78 (Dec. 21, 2010). The Federal Register has recently noted that "section 7(r) of the FLSA does not specify any penalties if an employer is found to have violated the break time for nursing mothers requirement." 75 Fed. Reg. 80073-78 (Dec. 21, 2010) (citing 29 U.S.C. 216(b)). While it may be true that 29 U.S.C.

207(r)(1)-(4) does not set forth specific remedies for violations of that particular provision, it is part of the FLSA and it is those remedies that are available.[2]

Section 216(b) specifies the damages that are available for FLSA violations:

(b)     Damages; right of action; attorney's fees and costs;

Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

Section 215(a)(2)-(3) provides:

(a)     …it shall be unlawful for any person—

    (2)     to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of this title, or any of the provisions or regulation or order of the Secretary issued under section 214 of this title;

    (3)     to discharge or in any other manner discriminate against any employee because such employee has filed a complaint or instituted or caused to be instituted any proceeding under or related to this chapter…

When an employer discriminates against an employee for complaining that her employer is not providing her a place to privately express breast milk, the complaining employee has a private right of action against the employer to collect lost wages and other appropriate remedies.

---

[2] Although not mandatory authority, in the interest of full disclosure, Plaintiff would alert the Court to Judge O'Brien's recent decision on this issue in *Salz v. Casey's Marketing Co.*, 11-CV-3055 (N.D. Iowa, July 19, 2012).

29 U.S.C. 215(a)(3); 29 U.S.C.216(b).  On July 19, 2010, Angela told Karla Neel that she was

not being provided with a place to express milk and begged Ms. Neel to help her. (Ames Dep.

97-99) (P. App. 10).  However, rather than lift a finger to help Angela find a place to pump, Ms.

Neel handed Angela a piece of paper, told her what she needed to write in order to resign, and

told her "Maybe should just stay home with your babies." (Ames Dep. 99, 155) (P. App. 10, 13).

For the reasons set forth in section IV(B)(2), below, a reasonable jury could find that giving a

mother a choice between keeping her job or providing the best nutrition possible for her infant is

no choice at all, and that Angela was constructively discharged.  Angela's constructive discharge

resulted in lost wages which are recoverable under Section 216(b).

### B.  DEFENDANTS VIOLATED 29 U.S.C. 207(r)

While Defendants are correct that, on July 19, 2010, they did not discipline Angela for

spending time away from her desk to beg various people to help her find a place to pump, this is

hardly evidence that they complied with the requirements of 29 U.S.C. 207(r).  To the contrary,

the inescapable fact remains that that **Angela was never actually given access to _any_ place to**

**pump on July 19, 2010.**  At no point in time on July 19, 2010, was Angela taken to _any_ room

and told that she could immediately use it to express milk.  The closest she ever got was when

Nurse Sara (Sagers) Hallberg told Angela that she _might_ be able to use a sick room if she

returned in 15 to 20 minutes because a sick person was currently using the room and security

would soon be checking on them.  **However, Ms. Hallberg never actually provided Angela**

**with access to a sick room**—Karla Neel forced Angela to resign before a sick room became

available.

All of Defendants' alleged "undisputed facts" regarding Ms. Hallberg leading Angela to a

sick room and offering that sick room for her immediate use are fervently disputed by Plaintiff

and underscore why this case must be decided by a jury.  Angela and Ms. Hallberg provide

diametrically different accounts of what happened on July 19, 2010.  Certainly, whether Angela was ever actually offered a place to express milk is a central issue in this case and a jury needs to decide whether Ms. Hallberg or Angela are telling the truth about what happened on July 19, 2010.

Nevertheless, even the sick room Ms. Hallberg offered for Angela's potential future use would not satisfy the requirements of 29 U.S.C. 207(r) because it was not free from intrusion and shielded from view of other employees because **the lock on the door did not work**.  Such a room simply does not satisfy the privacy requirements of 29 U.S.C. 207(r) because any of Angela's co-workers could have entered the room and observed Angela expressing milk.  Ms. Hallberg admits that whether she told Angela that the door to the sick room was broken is a disputed fact between the parties. (Hallberg Dep. 63) (P. App. 31).

Moreover, the proposed sick room would not have satisfied the implied cleanliness requirements of 29 U.S.C. 207(r).  Nurse Hallberg, herself, discouraged Angela from using the sick room to express milk because her milk could be exposed to illness.  Additionally, as Plaintiff's expert witness, Dr. Renee Cramer, explains, the language of 29 U.S.C. 207(r) implies that the room must meet certain cleanliness requirements:  "In offering Ms. Ames a 'sick room,' that had recently been occupied, *Nationwide* violated the very language of the [29 U.S.C. 207(r)], which specifies that provided lactation areas must be "sanitary," as well as guidance letters provided by the United States Breastfeeding Committee, which indicates that such spaces should be free of mold and bacteria." (Cramer Report 26-27) (P. App. 69-70).

Because a reasonable jury could find that Defendants did not actually offer Angela **any** room to express milk (much less one that actually complied with 29 U.S.C. 207(r)), Defendants' Motion for Summary Judgment on this claim must be denied.

## IV.    A REASONABLE JURY CAN FIND THAT DEFENDANTS DISCRIMINATED AGAINST PLAINTIFF ON THE BASIS OF HER SEX AND PREGNANCY

Because Plaintiff's sex and pregnancy discrimination claims are entirely intertwined and are subject to the same analysis under the law, they should be examined together.    The Pregnancy Discrimination Act extends Title VII's prohibition of sex discrimination to discrimination based upon "pregnancy, childbirth, or related medical conditions."   42 U.S.C. § 2000e(k).  The Iowa Civil Rights Act specifically prohibits pregnancy discrimination as well as sex discrimination.  IOWA CODE §§ 216.6(1)(a), 216.6 (2)(a).  Generally no distinction is made between claims based on federal law and comparable state law claims under the Iowa Civil Rights Act.  *Podkovich v. Glazer's Distribs. of Iowa ,* 446 F. Supp. 2d 982, 1012 (N.D. Iowa 2006);  *Beard v. Flying J., Inc.,* 266 F.3d 792, 798 (8th Cir. 2001).  The Iowa Supreme Court has recognized that federal precedent is applicable to most aspects of discrimination claims under the Iowa Civil Rights Act.  *Id.; Vivian v. Madison,* 601 N.W.2d 872, 873 (Iowa 1999).  Therefore, Angela's state and federal sex and pregnancy discrimination claims will be analyzed together.

### A.  PLAINTIFF HAS DIRECT EVIDENCE OF DISCRIMINATION

"There are two ways for an employee to survive summary judgment in a Title VII sex discrimination claim. The first method for surviving summary judgment requires the employee to present direct evidence of discrimination.  If direct evidence is unavailable to the employee, then he or she may employ the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), to establish an inference of unlawful discrimination. *Pospisil v. O'Reilly Auto., Inc.,* 619 F. Supp. 2d 614, 623 (N.D. Iowa 2007) (*citing Tenge v. Phillips Modern Ag Co.,* 446 F.3d 903, 907 (8th Cir.2006).

Despite Defendants' blanket assertion to the contrary, Plaintiff **does** have direct evidence of discrimination.  "'Direct evidence' is 'evidence showing a specific link between the alleged

discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action.'" *Schoonover v. Schneider Nat. Carriers, Inc.,* 492 F.Supp.2d 1103, n.24 (*citing Fjelsta v. Zogg Dermatology, PLC,* 488 F.3d 804, 809, 2007 WL 1531237 at *3 (8th Cir.2007) (quoting *Griffith v. City of Des Moines,* 387 F.3d 733, 736 (8th Cir.2004)))); *accord Thomas v. First Nat'l Bank of Wynne,* 111 F.3d 64, 66 (8th Cir.1997). "Direct evidence is evidence that, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Portis v. First Nat. Bank of New Albany*, 34 F.3d 325, 328-29 (5th Cir. 1994) (quoting *Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993)). "[D]irect evidence includes any statement or written document showing a discriminatory motive on its face." *Portis*, 34 F.3d at 329. "A Plaintiff in an employment discrimination case may avoid summary judgment when she presents direct evidence which is 'strong enough to show 'a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the employment decision.'" *Pospisil v. O'Reilly Auto., Inc.,* 619 F. Supp. 2d 614, 625 (N.D. Iowa 2007) (citing *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.,* 444 F.3d 961, 965 (8th Cir.2006)). Plaintiff can present such evidence in the case at bar.

Within hours of her return from maternity leave, Karla Neel forced Angela to resign and said "Maybe you should just stay home with your babies." Karla Neel made this comment to Angela **at the exact same time she was handing Angela a piece of paper and telling her what she needed to write down in order to resign**. Although Neel denies that she made this comment, the Court must assume that it was made because the Court must review the facts in the light most favorable to the nonmoving party.

Other courts have held that similar comments constituted direct evidence of discrimination. *See Sheehan v. Donlen Corp.,* 173 F.3d 1039 (7th Cir. 1999), (employer's comments at time of firing that plaintiff would be "happier at home with her children"; that "hopefully this will give you some time to spend with your children"; and "this would be a good time for [plaintiff] to spend some time with her family" constituted direct evidence of pregnancy discrimination); *Diemer v. Fraternal Order of Police,* 2007 WL 4232701 (N.D. Ill. 2007) (direct evidence of discrimination existed where plaintiff's superior told her in connection with her termination that it was for the best and she should "stay home with the baby"); *Rolon v. Pep Boys—Manny, Moe & Jack*, 601 F. Supp. 2d 464 (D. Conn. 2009), (the fact that the plaintiff's supervisor told her to "go home and be with your baby" shortly after returning from maternity leave was sufficient to raise an inference of sex and pregnancy discrimination).

The *Sheehan* court noted that direct evidence of discrimination is "'evidence which in and of itself suggests' that someone with managerial authority was 'animated by an illegal employment criterion'" and that "[e]ven isolated comments may constitute direct evidence of discrimination if they are 'contemporaneous with the discharge or causally related to the discharge decision making process.'" *Sheehan*, 173 F.3d at 1044 (quoting *Venters v. City of Delphi,* 123 F.3d 956, 972 (7th Cir.1997); *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 723 (7th Cir.1998)). In *Sheehan*, the court noted that a reasonable jury could find that the manager's comments that the plaintiff could "'spend more time at home with her children' reflected unlawful motivations because it invoked widely understood stereotypes the meaning of which is hard to mistake." *Id*. at 1044-45.

The same is true in the present case. Neel's comment is direct evidence that Defendants constructively discharged Angela because of her sex and pregnancy. A reasonable jury could certainly find that Neel's statement, made at the time she constructively discharged Angela,

provides a very specific link between these characteristics and her constructive discharge. A reasonable juror could find that Angela's sex and pregnancy motivated Defendants' decision to constructively discharge her. Because Plaintiff has presented direct evidence that she was constructively discharged due to discrimination, summary judgment on this issue is not appropriate.

### B. PLAINTIFF CAN ALSO PROVE HER CASE VIA THE INDIRECT METHOD

However, if the Court were to find that Neel's statement that Angela should "stay home with her babies" is not direct evidence, she is nevertheless able to make a prima facie case that her constructive discharge was a result of discrimination.

To do so, Plaintiff must show that "(1) she was a member of the protected group; (2) she was qualified to perform the job;[3] (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1038 (8th Cir. 2010) (*quoting Bearden v. Int'l Paper Co.*, 529 F.3d 828, 831(8th Cir. 2008). "The required prima facie showing is a 'flexible evidentiary standard' that was 'never intended to be rigid, mechanized, or ritualistic.'" *Id*. at 1039 (*quoting Swierkiewicz v. Sorema N.A.*, 534 US 506, 512 (2002)).

### 1. PLAINTIFF WAS A MEMBER OF A PROTECTED GROUP

Defendants are misguided in their argument that Title VII and the Iowa Civil Rights Act do not prohibit discrimination against lactating female employees. The plain language of the statute makes clear that discrimination based on "pregnancy, childbirth, or related medical conditions" violates Title VII. 42 U.S.C. §2000e(k). "Under the common meaning of the words that make up the phrase 'related medical conditions,' it would appear that any health-related

---

[3] Plaintiff will not address this element in her Resistance, as Defendants have indicated that they will agree that Plaintiff can satisfy this element for the purposes of their Motion for Summary Judgment. (D. Brief 15).

status of an individual connected with, or caused by, pregnancy or childbirth would be within the scope of that phrase." L. Camille Hebert, <u>The Causal Relationship of Sex, Pregnancy, Lactation, and Breastfeeding and the Meaning of 'Because of … Sex' Under Title VII</u>, 12 Geo. J. Gender & L. 119, 138 (2011). "'[L]actation would appear to be such a condition or status. Lactation is the physical condition by which the mammary glands in the breasts of a woman who has recently given birth produce milk after birth …." *Id.* "[G]iven the physiological aspects of lactation," lactation "has a clear, undeniable nexus with pregnancy and with childbirth. Therefore, it necessarily follows that lactation is 'because of or on the basis of pregnancy' and that women who are lactating are women affected by pregnancy [or] childbirth.'" *Allen v. Totes/Isotoner Corp.*, 915 N.E.2d 622, 630 (Ohio 2009) (O'Conner, J. concurring).

Moreover, the Iowa Supreme Court has recognized the common sense link between pregnancy and lactation and has already rejected the argument Defendants attempt to make in the case at bar. In *Deboom v. Raining Rose, Inc.*, 772 N.W.2d 1 (2009),[4] the plaintiff was fired shortly after returning from maternity leave and subsequently filed a lawsuit alleging both sex and pregnancy discrimination. *Id.* at 4. The defendant argued that the plaintiff did not qualify for protection under the Iowa Civil Rights Act because she was no longer pregnant when she returned to work. *Id.* at 6. The Court squarely rejected this narrow interpretation of the Iowa Civil Rights Act. *Id.* at 8. The Court noted that "federal courts have interpreted the federal Pregnancy Discrimination Act (PDA) as applying to women who are not pregnant and to women who have taken authorized maternity leave." *Id.* at 7 (citing *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Johnson Controls, Inc.*, 499 U.S. 187, 206 (1991); *Smith v. F.W. Morse & Co.*, 76 F.3d 413, 424 (1st Cir. 1996)). In keeping with that broad interpretation

---

[4] Defendants fail to cite *Deboom v. Raining Rose* in section B of their Brief in Support of Motion for Summary Judgment, despite the fact that it is mandatory authority directly on point.

of federal law, the Iowa Supreme Court held that it would "interpret the phrase 'a person disabled by pregnancy because of the employee's pregnancy' broadly to include women affected by pregnancy, childbirth, and other related conditions." *Id*. at 8 (citing IOWA CODE § 216.6(2(d)). The Court stressed that "[s]uch a broad interpretation is necessary to effectuate the purpose of the statute." *Id*. (citing *Int'l Union*, 499 U.S. at 205 (legislative history reveals purpose of federal PDA is 'to protect female workers from being treated differently from other employees simply because of their capacity to bear children.'))

Furthermore, the cases from other jurisdictions Defendants cite in their Brief are factually distinguishable and legally inapposite and some are no longer even *good law*. For example, the *Martinez* case did not include any allegation of a PDA violation; rather, the plaintiff alleged a violation of the Americans with Disabilities Act and a Title VII disparate treatment claim based on a "sex plus" discrimination theory. In ruling against the plaintiff, the *Martinez* court relied upon *General Electric Co. v. Gilbert*, 429 U.S. 125 (1976), the holding of which was overruled by Congress by the subsequent enactment of the PDA. Additionally, a few years after the PDA's enactment, the Supreme Court repudiated the "*Gilbert* test" as having been overruled by the PDA. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 678 (1983) (stating "When Congress amended Title VII in 1978, it unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision").

Recently, the United States District Court for the District of Colorado addressed this issue and held that many of the other authorities cited by Defendant simply do not hold water:

> A brief overview of the current law surrounding lactation, employment, and the PDA may prove enlightening, as recent cases involving these matters seem a bit confused. Earlier cases centered on the issue of an employee's desire to breastfeed her child. *See, e.g., Fejes,* 960 F.Supp. at 1492; *Wallace,* 789 F.Supp. 867, 869 (W.D.Ky.1990), *aff'd,* 951 F.2d 351 (6th Cir.1991); *Barrash v. Bowen,* 846 F.2d 927. Such concerns are not within the language of the PDA, as the PDA "only provides protection based on the condition of the mother." *Fejes,* 960 F.Supp. at

1492. When, as in *Fejes* and *Wallace,* a plaintiff claims discrimination after being terminated for not returning to work because of a desire to stay at home to breastfeed, her claim will not prevail. *Fejes,* 960 F.Supp. at 1492; *Wallace,* 789 F.Supp. at 869.

A second scattering of cases, the majority of which remain unreported, address lactation and breast-pumping directly; however, the logic applied does not comport with the language of the PDA or the pre-existing jurisprudence on the issue. *Martinez v. N.B. C., Inc.* directly addresses and declines to extend Title VII protection to breast pumping in the workplace. 49 F.Supp.2d 305 (S.D.N.Y.1999). Yet in order to do so, the *Martinez* court relied heavily on *Gilbert,* the case that originally excluded pregnancy discrimination from Title VII. *Gilbert,* 429 U.S. at 145–146. As the Supreme Court acknowledged in *Newport News,* Congress, via the PDA, "unambiguously expressed its disapproval of both the holding and the reasoning of the Court in the *Gilbert* decision." Newport News, 462 U.S. at 678. The PDA explicitly and purposefully contradicts and supersedes *Gilbert.* As such, the logic of *Gilbert* cannot apply to claims involving "related medical conditions" protected by the PDA.

A few other courts have also ruled against extending PDA protection to lactation concerns. *Jacobson v. Regent Assisted Living, Inc.,* No. CV–98–564–ST, 1999 WL 37390, at * 11 (D.Or.1999); *E.E. O.C. v. Houston Funding II, LTD.,* 114 Fair Empl. Prac. Cas. (BNA) 799 (S.D.Tex.2012) (holding that "[f]iring someone because of lactation or breast-pumping is not sex discrimination."). These rulings, however, misapply *Wallace,* citing that case to support their conclusions. In doing so, they fail to recognize that the breast-feeding in *Wallace* dealt with the condition of the child, while the claims in the cases before them dealt with physiological conditions experienced by the mother.

**As it stands, no existing case law correctly excludes lactation or other conditions experienced by the mother as a result of breast-feeding from Title VII protection under the PDA. A plaintiff could potentially succeed on a claim if she alleged and was able to prove that lactation was a medical condition related to pregnancy, and that this condition, and not a desire to breastfeed, was the reason for the discriminatory action(s) that she suffered.**

*Falk v. City of Glendale*, 2012 WL 2390556 (D. Colo. June 25, 2012) (emphasis added).

These broad interpretations of the Iowa Civil Rights and at Title VII are really the only logical interpretations. After all, although a pregnancy eventually ends, a defendant's discriminatory animus resulting from the pregnancy may continue. The protections of the Iowa Civil Rights Act, Title VII, and the Pregnancy Discrimination Act would have no meaning if an employer were allowed to simply wait until an employee gives birth and then take adverse

action.  Instead, employees must be protected following the end of a pregnancy.  In holding that

discrimination following a pregnancy can be actionable, the court in *Donaldson v. Am. Banco*

*Corp., Inc.* noted that the language and legislative history of Title VII and the Pregnancy

Discrimination Act does not speak to the timing of an adverse action, but instead only to the

employer's basis for the adverse action.  *Donaldson v. Am. Banco Corp., Inc.*, 945 F.Supp. 1456,

1464 (D. Colo. 1996).  The court noted that if an employee could only seek redress for an

adverse action taken during pregnancy, Title VII would be emasculated because an employer

would simply wait until the employee gave birth.  *Donaldson*, 945 F.Supp. at 1464 ("It would

make little sense to prohibit an employer from firing a woman during her pregnancy but permit

the employer to terminate her the day after delivery if the reason for termination was that the

woman became pregnant in the first place.").

  In *Bond v. Sterling*, the court noted Congressional intent to protect a woman from

pregnancy-related discrimination "before, during, and after her pregnancy," in denying a motion

to dismiss.  *Bond v. Sterling, Inc.*, 997 F. Supp. 306, 309 (N.D.N.Y. 1998).  In *Bond*, the plaintiff

had alleged that Defendant terminated her one month after the birth of her child and two weeks

after returning to work.  The defendant argued that the plaintiff could not establish that she was

in the protected class because she wasn't pregnant at the time of her termination.  The district

court held the plaintiff's allegation of termination one month after the birth of her child and two

weeks after returning to work was enough to establish her membership in the protected class and

to raise an inference of discrimination.  *Bond v. Sterling, Inc.*, 997 F. Supp. 306, 309 (N.D.N.Y.

1998).

  In *Smith v. K & F Industries, Inc.*, 190 F. Supp. 2d 643, 649-50 (S.D.N.Y. 2002), the

employer expressly argued that since plaintiff was terminated after returning from her maternity

leave, and was therefore no longer pregnant, that it could not be liable for pregnancy

discrimination.  The court rejected this argument and agreed with plaintiff that the pregnancy

discrimination act applies to "women affected by pregnancy [and] childbirth," citing 42 U.S.C. §

2000e(k), and held that the plaintiff's non-pregnant status at the time of termination did not

preclude the action.

Therefore, it is immaterial that Angela was no longer pregnant when she returned to work

on July 19, 2010, because she continued to be "affected by pregnancy, childbirth, and other

related conditions" because she was lactating.  *Deboom*, 772 N.W.2d at 8.

Additionally, it is undisputed that Angela Ames is female.  Increasingly, courts are

addressing the affect that an employee's family responsibilities (both real and perceived) have on

employers and are prohibiting the stereotypes that sadly still more often harm women in the

workforce.  *See Chadwick v. Wellpoint, Inc.*, 561 F.3d 38, 44-48 (1st Cir. 2009)("[g]iven the

common stereotype about the job performance of women with children…a reasonable jury could

find that [defendant] would not have denied a promotion to a similarly qualified man because he

had 'too much on his plate' and would be 'overwhelmed' by the new job, given 'the kids' and

his schooling").  Unfortunately, the following stereotypes about women in the workforce

continue to exist:

- Working mothers are not committed to their jobs.
- Working mothers have lower performance because their family is their first priority.
- Working mothers will not put in the hours necessary to get the job done.
- Working mothers will be gone more frequently due to childcare issues.

In *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003), the United States

Supreme Court took judicial notice of the stereotype that women cannot balance family and work

responsibilities.  It was exactly this type of gender discrimination Angela confronted when she

returned to work on July19, 2010, and Karla Neel told her to "stay home with [her] babies."  At

that time, Ms. Neel was aware that Angela was now the mother of two very young children, both under the age of one and a half.

In sum, Angela was clearly the member of two protected classes on July 19, 2010—she was both female and affected by a pregnancy related condition—lactation.

## 2. A REASONABLE JURY COULD FIND DEFENDANTS CONSTRUCTIVELY DISCHARGED PLAINTIFF

Defendants ask this Court to find, <u>as a matter of law</u>, that it was not intolerable for Defendant to cause Angela physical pain as her breasts became increasingly engorged, to effectively prevent her from optimally nourishing her child, and to threaten her with almost certain discipline. These are questions of fact that must be decided by the jury. *See Strickland v. United Parcel Service, Inc.*, 555 F.3d 1224, 1229 (10th Cir. 2009) ("Whether the conditions at UPS were objectively intolerable is a question of fact for the jury.")

"To establish a claim for constructive discharge, the plaintiff must show that the employer 'deliberately create[d] intolerable working conditions with the intention of forcing the [plaintiff] to quit.'" *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247 (8th Cir. 1998) (quoting *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 495 (8th Cir. 1996)) (alterations in original). "'The plaintiff can satisfy the intent requirement by demonstrating that [she] quit as a reasonably foreseeable consequence of the employer's discriminatory actions.'" *Id.* (quoting *Tidwell,* 93 F.3d at 495) (alterations in original).

Angela satisfies the elements for constructive discharge because a reasonable person in her position would have found continued employment under the conditions she faced to be intolerable, and Defendants either intended to force her to resign or could have reasonably foreseen that she would do so as a result of their actions. *See, e.g., Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999).

Although the test is an objective one, the jury is directed to consider the evidence from a reasonable person "*in the employee's position*."  *Pennsylvania State Police v. Suders*, 549 129, 140 (2004); *see also Serriccho v. Wachovia Sec., L.L.C.*, 658 F.3d 169, 185 (2d Cir. 2011) (work environment must be judged from standpoint of a reasonable person "in the employee's shoes").  For example, in *Emeldi v. Univ. of Oregon*, 673 F.3d 1218, 1225 (9th Cir. 2012), the plaintiff's resignation from her Ph.D. program had to be examined in the light of someone who had just been "abandoned by her dissertation chair and who was unable, despite diligent efforts, to secure a replacement chair."  Therefore, in the case at bar, the jury will be instructed to consider the evidence from the standpoint of a woman who is eight weeks post-partum, lactating, and whose breasts are engorged from not being allowed to express milk.

The day Angela was forced to resign was her first day back to work from maternity leave.  Not only was she battling the array of hormones common in a woman eight weeks post-partum, she was also wresting with a common emotional conflict—excitement to return to work but apprehension about leaving one's newborn.  From the moment she arrived at work, obstacle after obstacle was laid in Angela's path.  First, Nurse Sara Hallberg told Angela that she would not have access to a lactation room for three days and that the only room she <u>may</u> be able to eventually use that day was a sick room that Nurse Hallberg discouraged her from using because her milk could be exposed to germs.  Left to weigh the increasing physical pain in her breasts and the risk of potentially pumping in a sick room, Angela then went to talk to her supervisor, Brian Brincks, about the status of her work.  During this meeting, Mr. Brincks chose to tell Angela that none of her work had been done while she had been gone and that she would need to work a great deal of overtime in the coming weeks or risk being disciplined.  Desperate for someone to help her relieve the physical pain of her engorged breasts, Angela went to Karla Neel to beg for help in finding a place to pump.  However, rather than lift a finger to do anything at all

to help Angela, Ms. Neel instead told Angela that she "should stay home with her babies," gave her a piece of paper, and told her what to write in order to resign.

By the time Karla Neel successfully forced Angela to resign, it had been over <u>five hours</u> since she had last expressed milk and Angela was in considerable physical pain. As Dr. Renee Cramer, explained: "By the time [Angela] had the conversation with Karla Neel, resulting in her involuntary resignation from Nationwide, Ms. Ames would likely be experiencing extreme physical discomfort. Specifically, her breasts would be hot, and tender to the touch; they would feel as though they were swelling, or inflating with milk; and her nipples would be leaking." (Cramer Report 28-29) (P. App. 71-72).

This physical pain and stress were compounded by what Dr. Cramer identifies as a pattern of "micro-aggression" in the months leading up to her maternity leave:

> Ms. Ames cites several instances of micro-aggression in her workplace that taken cumulatively, indicate a pattern of discrimination and hostility impermissible under the law. She states in her deposition that Ms. Neel assigned her extra tasks in a way that felt like retribution for her pregnancy, rolled her eyes at discussions of pregnancy-related accommodations, made condescending and arrogant remarks about how Ms. Ames was treating her pregnancy, and made insensitive comments about babies who died in utero. While it may sound vague when Ms. Ames states "there was always a negative innuendo from her to me," marginalized and subordinated people are often very clear about just how unclear, vague, and full of innuendo the comments and remarks about their (lower, subordinate) status are. What Ms. Ames reports is typical of micro-aggression in educational and work settings: remarks that seem to fall just short of actionable, but that, added up over time, create a hostile and discriminatory environment. In this environment even the "teasing" remarks reported by Ms. Ames from Mr. Brinks are easily, and justifiably, interpreted as hostile.

> Barbara Perry's landmark study of micro-aggression experienced by women and American Indians in university settings shows that the typical response, of women in particular, to such cumulative hostility, is to become "exhausted," and "despondent," – to "simply give up" (Perry, 114 and throughout). In my expert opinion, Ms. Ames' coerced resignation is understandable in light of the micro-aggression and hostility she had faced at Nationwide.

(Cramer Report 25-26) (P. App. 68-69).

While each of these events, taken individually, may not have forced Angela to resign, they compounded in the perfect storm of emotional and physical pain Karla Neel and Brian Brincks crafted on July 19, 2010. It is fundamental that the Court not accept Defendants' invitation to view the evidence in a piecemeal fashion because these events did not occur in a vacuum. *See Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999). As the Tenth Circuit has held: "[f]acially neutral abusive conduct can support a finding of …animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other…discriminatory conduct." *Jordan v. City of Cleveland*, 464 F.3d 584 (6th Cir. 2006) (citing *O'Shea v. Yellow Tech. Servs*. 185 F.3d 1093, 1097 (10th Cir. 1999)).

Dr. Cramer provides an apt summation on how all of these factors combined on July 19, 2010, to result in Angela's forced resignation:

> The emotional toll of the past two years, coupled with the physical and emotional distress caused by Nationwide's refusal of access to a nursing room, made Ms. Ames feel, in the moment that Ms. Neel offered her pen and paper and suggested that she stay home with her "babies," as though she had no choice to continue working.

(Cramer Report 28) (P. App. 71).

Indeed, a reasonable jury could find that the actions of Karla Neel and Brian Brincks on July 19, 2010, in particular, were intentionally crafted to apply maximum pressure on Angela at a time when they knew her to be emotionally vulnerable. Brian Brincks did not have to tell Angela within hours of her return from maternity leave that none of her work had been done and that she would be working a great deal of overtime to try to catch up—but he did. Brian Brincks did not have to threaten to discipline Angela if she did not get caught up on all of her work within the next two weeks—but he

did.  Karla Neel could have offered to let Angela go home and pump and return the next day (or even that afternoon) with a clear head—but she did not.  Karla Neel could have helped Angela find a place to pump that morning—but she did not.  Karla Neel could have said or done <u>anything at all</u> to convince Angela not to quit—but she did not.  These facts beg the question:  Why on earth not?  Plaintiff has set forth sufficient evidence for the jury to infer the simple answer to this question:  Because Defendants <u>intended </u>for Angela to resign on July 19, 2010.

In fact, the jury could infer from the evidence that Defendants did not intend for Angela to ever return to work after her maternity leave.  Angela testified that Angie Ebensberger was hired for Angela's position while she was on leave and when Angela returned to work on July 19, 2010, Ms. Ebensberger's belongings were on Angela's desk.  The jury may infer from these facts that Defendants replaced Angela with Ms. Ebensberger while she was on maternity leave and Defendants never intended to allow Angela to return from work.

Moreover, when Karla Neel discovered that Angela's maternity leave had been "accidentally" miscalculated, rather than just allow Angela to take the additional two weeks of leave unpaid (which Ms. Neel avers was an option), she called Angela and insisted that she return to work early or risk "raising red flags" down the road.  Throughout this litigation, Defendants have indicated their belief that Angela never really intended to return to paid employment outside the home after her son was born and that her resignation on July 19, 2010, was part of an elaborate pre-calculated rouse.  If this was truly what Karla Neel and Brian Brincks believed in the summer of 2010, then a jury will be able to infer that Ms. Neel's actions in forcing Angela to return to work early was calculated to push Angela to decide not to return at all.  However, when Angela's resolve

to return to her job at Nationwide proved strong, Defendants had to implement a new plan.

However, even if the jury were to decline to find that Defendants acted with the intent to force Angela to resign when she returned to work on July 19, 2010, they could certainly find from this evidence that it was foreseeable that Angela would resign when they failed to provide her with a place to express milk and threatened her with almost certain discipline. *See Van Meter Indus. v. Mason City Human Rights Commission*, 675 N.W.2d 503, 512 ("It is sufficient that the employee's resignation was a reasonably foreseeable consequence of the insufferable working conditions created by the employer.") The reality is that Angela had not expressed milk for over <u>five hours</u> at the time she resigned and she was in considerable physical pain. Angela's need for a place to pump was growing more and more urgent every minute she was at Nationwide on July 19, 2010. A reasonable jury could certainly find that it was foreseeable that Angela would quit when Defendants continued to fail to give her a place to pump.

Defendants make much of Plaintiff's deposition testimony that the events of July 19, 2010, were not "intolerable." However, Defendants fail to mention that Angela later clarified that during this testimony she was referring to her tolerance for physical pain— whether it would have been <u>physically</u> possible for her to tolerate the pain in her breasts that would result from not pumping for awhile longer. (Ames Dep. 152) (P. App. 12). Angela explained that it <u>*was*</u> intolerable to her that Defendants did not provide her with a clean, private place to express milk, that Defendants caused her physical pain, that Defendants effectively prevented her from nursing her child, and that she was threatened with discipline if she did not work a great deal of overtime her first week back from maternity leave. (Ames Dep. 152-53, 157) (P. App. 12-13, 14). This is an important

28

distinction because "an employee's work environment need not be literally unbearable in order to effect a constructive discharge." *Van Meter*, 675 N.W.2d at 511. The law does not require that Angela be writhing in pain before the law will consider her to have been constructively discharged.

Finally, Defendants claim that Plaintiff's constructive discharge claim must fail because she did not give Nationwide an opportunity to remedy the problem. This is a blatant misstatement of the record. In reality, on July 19, 2010, Angela told Karla Neel that she was not being provided with a place to express milk and begged Ms. Neel to help her. However, rather than lift a finger to help Angela, Ms. Neel told her to resign.

Defendants completely ignore the fact that this chance for Ms. Neel to fix the problem was all that could reasonably be expected of Angela under the circumstances. Angela needed a place to express milk *at the time she requested it* on July 19, 2010. It is unreasonable for Defendants to even suggest that she could wait hours or days while waiting for Nationwide to fix the problem and provide her with a place to pump. Certainly, doing so would have been excruciatingly painful and devastating to Angela's milk supply. (Tinker Report 8) (P. App. 85); (Cramer Report 26) (P. App. 69). Courts have held that "[i]f continued employment would compromise an employee's personal safety…we do not expect an employee to remain on the job while the employer tries to remedy the problem." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007). In the case at bar, remaining at work meant that Angela's breasts would have continued to fill with milk without any relief. The physical ramifications of this could range from painful engorgement to eventual mastitis.[5] (Cramer Report 26) (P. App. 69).

---

[5] Mastitis is an infection of the breast tissue that results in breast pain, swelling, warmth and redness of the breast and requires treatment with a course of antibiotics.
*See* http://www.mayoclinic.com/health/mastitis/DS00678

### 3. A REASONABLE JURY COULD FIND THAT THE CIRCUMSTANCES SURROUNDING PLAINTIFF'S CONSTRUCTIVE DISCHARGE PERMIT AN INFERENCE OF DISCRIMINATION

A reasonable jury could find that this element is satisfied for all the reasons discussed above. Before Defendants forced Angela to resign, she endured a barrage of comments from Karla Neel and Brian Brincks specifically about her pregnancy and upcoming maternity leave. These comments all made it very clear to Angela that her pregnancy was an inconvenience to Defendants.

While Angela was on maternity leave, they replaced her and then attempted to get her to quit by forcing her to come back to work earlier than she had expected. When that did not work, Defendants forced Angela to resign <u>the same morning she returned from maternity leave</u>. When Karla Neel forced Angela to resign, she told Angela that she should "stay home with her babies." This comment is laced with stereotypical ideas about the ability of a mother to also be a committed employee. Based on these facts, a reasonable jury could find that the circumstances surrounding Plaintiff's constructive discharge permit an inference of discrimination.

## V. IT WOULD BE IMPROPER FOR THE COURT TO GRANT SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES UNDER TITLE VII

Defendants ask this Court to hold, as a matter of law, that Plaintiff cannot recover punitive damages under the Title VII[6] because Nationwide has anti-discrimination policies and because it conducts training for its employees on those policies. However, as Dr. Cramer aptly

---

[6] It is unclear from Defendants' Brief whether they are moving for summary judgment on Plaintiff's claim for punitive damages under the ICRA. Plaintiff disagrees with Defendants' assertion that it is established law that punitive damages are not available under the ICRA. To the contrary, in late March 2012, the Iowa Supreme Court granted interlocutory appeal to decide <u>this very issue</u> in the case of *Robin Drake and Heather Miller v. Manley Toy Direct L.L.C., Toy Network L.L.C., et al.*, Warren County LA 32931. However, the same reasons Defendants' Motion for Summary judgment is inappropriate with respect to punitive damages under Title VII apply equally to Plaintiff's claim for punitive damages under the ICRA.

stated: "[G]ood policy, in the absence of proper implementation, is worthless. (Cramer Report 23) (citing Bumiller, 1987; Cahill, 2001; Edelman, 2003; Nielsen, 2008). While Nationwide's policies look good on paper, there is very little evidence to suggest that they were actually followed in the case at bar or that the employees involved in this case chose to implement anything they supposedly learned in an anti-discrimination training when it came to Angela Ames. *See* Plaintiff's Response to Defendants' Statements of Fact ¶¶ 6-19, 45-48.

Though an employer *may* obtain protection from punitive damages by showing its good faith efforts to comply with Title VII, "where an employer discriminates in contravention of its own policies, the existence of those policies does not allow the employer to escape punitive damages." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 931 (8th Cir. 2004).

Defendants cite *Pospisil v. O'Reilly Automotive, Inc.*, 619 F.Supp.2d 614, 632 (N.D. Iowa 2007), to support their proposition that policies forbidding discrimination, coupled with training regarding the policies, results in a finding that the employer did not act with malice or reckless indifference for the plaintiff's federally protected rights. (D. Brief 36). However, the *Pospisil* court also took into account the employer's prompt investigation of the plaintiff's claims. *Pospisil*, 619 F.Supp.2d at 614. In the case at bar, there remains a genuine issue of material fact as to whether Defendants made a good faith effort to comply with Title VII or the Iowa Civil Rights Act for the reasons set forth above.

Moreover, the fact that Nationwide has these policies and apparently provides training on them actually bolsters Angela's claim for punitive damages because it shows that the individuals involved _knew_ they were violating Nationwide's policies and breaking the law. For example, when Karla Neel forced Angela to resign and told her "Maybe you should just go home with your babies"—she knew that she was violating the Iowa Civil Rights Act and Title VII. When Karla Neel and Sara Hallberg completely and utterly failed to provide Angela with a place to

pump—they <u>knew</u> that they were violating the Fair Labor Standards Act.  A reasonable jury could certainly find that committing these acts, and <u>knowing</u> that they are violating the law, warrants punitive damages.

## VI. IT WOULD BE IMPROPER FOR THE COURT TO GRANT SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES OR LIQUIDATED DAMAGES UNDER THE FLSA

Defendants assert that evidence of Nationwide's lactation program "support[s] a finding that Defendants acted in good faith and had a reasonable basis for believing they were in compliance with the FLSA." (D. Brief 38). "The employer bears the burden of proving both good faith and reasonableness, 'but the burden is a difficult one, with double damages being the norm and single damages the exception.'" *Choa v. Barbeque Ventures, LLC*, 547 F.3d 938, 941-42 (8th Cir. 2008) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 142 (2d Cir. 1999)). To avoid liquidated damages, the employer must satisfy a standard which imposes both subjective and objective tests for their good faith and reasonableness. *Id.* at 942. The subjective test requires "an honest intention to ascertain and follow the dictates of the FLSA." *Hultgren v. County of Lancaster*, 913 F.2d 498, 509 (8th Cir. 1990). Further, employer's position must be objectively reasonable. *Id.* Nationwide's reliance on the mere existence of a lactation program falls short of this requirement, as there has been no showing of Nationwide's "honest intention to ascertain and follow the dictates of the FLSA."  The reality is that Angela was not provided with <u>any</u> room to express milk on July 19, 2010.  Defendants did not make <u>any</u> effort to comply with the FLSA on July 19, 2010, when Angela needed a place to pump.  Therefore, summary judgment on this claim is inappropriate.

Defendants correctly note that the Eighth Circuit has not yet addressed whether punitive damages are available for violations of FLSA; however, when presented with the same question, the Seventh Circuit held that punitive damages were available. *Travis v. Gary*

*Community Mental Health Ctr.*, 921 F.2d 108, 112 (7th Cir. 1990).  District courts within the Eighth Circuit have also recognized such a remedy. *Wolfe v. Clear Title, LLC*, 654 F.Supp.2d 929, 936 (E.D. Ark. 2009) (noting that the "ordinary meaning of 'legal relief' as including punitive damages may be appropriate in some cases to effectuate the purposes of" FLSA); *O'Brien v. Dekalb-Clinton Counties Ambulance Dist.*, No. 94-6121-CV-SJ-6, 1996 WL 565817 at *6 (W.D. Mo. June 24, 1996) (unpublished). A detailed analysis of the issue was conducted by the Eastern District of Pennsylvania in *Marrow v. Allstate Sec. & Investigative Services, Inc.*, 167 F.Supp.2d 838 (2001).

## CONCLUSION

For all of the reasons stated above, Plaintiff respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety, allow Angela Ames her day in Court beginning on November 13, 2012, and for such other relief as is just and appropriate.

FIEDLER & TIMMER, P.L.L.C.

_____*/s/ Emily McCarty*_____
Brooke Timmer AT0008821
brooke@employmentlawiowa.com
Emily McCarty AT 0010147
emily@employmentlawiowa.com
2900 – 100th Street, Suite 209
Urbandale, IA 50322
Telephone: (515) 254-1999
Fax: (515) 254-9923
ATTORNEYS FOR PLAINTIFF

Copy to:

Kerrie M. Murphy
Julie T. Bittner
GONZALEZ SAGGIO & HARLAN
1501 42nd Street, Suite 465
West Des Moines, IA 50266-1090
ATTORNEYS FOR DEFENDANTS

**ELECTRONIC PROOF OF SERVICE**
I, hereby certify that on the 20th day of August, 2012, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which sent notification of said filing to all CM/ECF participants.

**Signature:** _____*/s/ Fiedler & Timmer*_____