IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| ANGELA AMES, | * | |
| | * | |
| | * | 4:11-cv-00359 RP-RAW |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| NATIONWIDE MUTUAL INSURANCE | * | |
| CO., NATIONWIDE ADVANTAGE | * | |
| MORTGAGE CO., and KARLA NEEL, | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| Defendants. | * | |
| | * | |

Before the Court is Nationwide Mutual Insurance Company's, Nationwide Advantage

Mortgage Company's (collectively "Nationwide"), and Karla Neel's ("Neel") (collectively the

"Nationwide Defendants" or "Defendants") Amended Motion for Summary Judgement and

Request for Oral Argument ("MSJ"), filed July 24, 2012.[1]  Clerk's No. 46.  On August 20, 2012,

Plaintiff Angela Ames ("Ames") timely resisted the Motion.  Clerk's No. 62.  Defendants replied

on August 30, 2012.  Clerk's No. 70.  This matter is fully submitted.[2]

I.  FACTUAL BACKGROUND

Ames's at-will employment as a loss mitigation specialist at Nationwide lasted from

---

[1]      On July 23, 2012, Defendants filed an MSJ that did not request oral argument.  *See*
Clerk's No. 44.  The next day, on July 24, 2012, Defendants amended the Motion by including
such a request.  *See* Clerk's No. 46.

[2]      On August 30, 2012, Ames requested an oral argument on the pending MSJ.  Clerk's No.
69.  The Court, however, does not believe that an oral argument would substantially aid it in
ruling on the motion.  *See* LR 7(c).  Accordingly, Ames's Motion for Hearing/Oral Argument
(Clerk's No. 69) is denied.

October 2008[3] to July 19, 2010.  Nationwide's Statement of Undisputed Facts in Supp. of MSJ ("Nationwide's Facts") ¶¶ 1–3, 43; Pl.'s Resp. to Nationwide's Facts ("Ames's Facts") ¶¶ 1–4.  Following the birth of her first child on May 2, 2009, Ames took eight weeks of maternity leave.  *See* Nationwide's Facts ¶ 52; Ames's Facts ¶ 52; Ames's Statement of Add'l Material Facts ("Ames's Add'l Facts") ¶ 2.  In October 2009, Ames found out that she was pregnant again.  *See* Ames's Add'l Facts ¶ 3.  Due to pregnancy complications, she began her maternity leave on April 11, 2010 prior to giving birth to her second child.  *See id.* ¶¶ 5–6.  Initially, Nationwide advised Ames that her maternity leave would expire on August 2, 2010.[4]  *See id.* ¶¶ 16–17; Nationwide's Facts ¶ 52.  In a June 16, 2010[5] telephone call between Neel[6] and Ames, however, Neel advised Ames that there had been a mistake in calculating her maternity leave and that Ames's leave would expire on July 12, 2010 rather than on August 2, 2010.[7]  *See* Ames's Add'l

---

[3]     The parties report different employment start dates.  Ames states that she began work at Nationwide on or about October 1, 2008.  *See* Pl.'s Resp. to Nationwide's Facts ("Ames's Facts") ¶ 1.  Nationwide, on the other hand, states that Ames's employment began on October 20, 2008.  *See* Nationwide's Statement of Undisputed Facts in Supp. of MSJ ¶ 1.

[4]     Due to what the Court perceives to be a typographical error, Nationwide reports that Ames's maternity leave was to end on August 2, 2012.  *See* Nationwide's Facts ¶ 52.

[5]     In her Complaint, Ames alleges that the telephone call took place on June 21, 2010.  *See* Am. Compl. ¶ 20.

[6]     At all relevant times, Neel was an Associate Vice President, who was in charge of overseeing the Loss Mitigation Department.  *See* Nationwide's Facts ¶ 5; App. to Nationwide's MSJ ("Nationwide's App.") at 54, p. 10:13–25.

[7]     The parties disagree as to whether Nationwide allowed Ames to return to work on August 2, 2010.  *Compare* Ames's Statement of Add'l Material Facts ¶ 20 (stating that, during the June 16, 2010 telephone call, "Neel[] insinuat[ed] that [Ames] would be disciplined (if not fired) if she did not return to work on July 19, 2010") *with* Nationwide's Facts ¶ 53 (stating that Nationwide allowed Ames to take until August 2, 2010 before returning to work).

Facts ¶ 16; Nationwide's Facts ¶¶ 51–52; App. to Nationwide's MSJ ("Nationwide's App.") at 204. As agreed during this telephone call, Ames returned to work on July 19, 2010 at approximately 10:00 a.m.[8] *See* Ames's Add'l Facts ¶ 22. She resigned from her position three hours later. *See* Nationwide's Facts ¶¶ 43, 70. The parties disagree on what exactly transpired over those three hours.

Shortly after reporting to work on July 19, 2010, Ames needed to express milk.[9] *See* Pl.'s App. in Supp. of Her Resistance to Nationwide's MSJ ("Ames's App.") at 4–5. When Ames told Sara Sagers, presently Sara Hallberg ("Hallberg"),[10] that she had to express milk immediately, Hallberg responded that Ames had to fill out paperwork[11] before being able to use one of the

---

[8] Ames reported to work around 10:00 a.m. because she had to take her newborn son to a routine doctor's appointment. *See* Ames's Add'l Facts ¶ 22.

[9] Ames states that, at the time, she was nursing her baby every three hours. *See* Pl.'s App. in Supp. of Her Resistance to Nationwide's MSJ at 4, p. 68:21–5, p. 69:2. On July 19, 2010, her first day following her maternity leave, Ames expressed milk around 6:30 a.m. *See id.* at 4, p. 68:16–20. Therefore, more than three hours had gone by when Ames reported to work.

[10] Hallberg was employed by Nationwide as a nurse. *See* Ames's App. at 30:9–11.

[11] There was a three-day waiting period before the paperwork could be processed and Ames given access to a lactation room. *See* Ames's App. at 7, p. 81:16–19; Nationwide's App. at 150–51. Ames claims that no one had ever advised her of this waiting period. *See* Ames's App. at 7, p. 82:20–24. Nationwide disagrees and points out that its lactation policy was available to Ames online, that Ames did not ask any questions regarding the lactation policy, and that she did not attend any of the quarterly maternity meetings although she knew about them. *See* App. Nationwide's App. at 84:14–85:16; 93:14–23; 81:5–14.

When, on July 19, 2010, it became clear that Ames had not filled out the paperwork requesting access to a lactation room, Hallberg sent two emails. The first one was addressed to Ames and contained Nationwide's lactation policy, which consists of approximately three pages. *See* Nationwide's App. at 148–51. With her second email, Hallberg requested expedited processing of Ames's application for access to a lactation room. *See id.* at 152.

lactation rooms.[12]  *See id.* at 7, p. 82:13–19.  To accommodate Ames's need to immediately

express milk, Hallberg suggested that she use one of the wellness rooms[13] or Hallberg's office.[14]

*See* Nationwide's App. at 72:5–21; 73:4–8.  Ames chose a wellness room that was going to

become available shortly.[15]  *See id.* at 73:21–25; Ames's App. at 91 ¶ 9.

    While waiting on the wellness room, Ames met with Brian Brinks[16] ("Brinks") "to catch

up on the status of [her] work."  Ames's App. at 91 ¶ 11.  Ames asserts that Brinks had promised

to take over her work while she was on maternity leave, but that nothing had been done.  *See id.*

at 43.  Ames also claims that, during the meeting, Brinks told her that she had two weeks to catch

up, that she had to work overtime to accomplish that, and that if she failed to catch up within two

weeks, she would be disciplined.  *See id.*; *see also id.* at 91 ¶ 12; Nationwide's App. at 52, pp.

80:15–82:25.  Nationwide agrees that such a meeting took place, but disagrees with Ames's

account of the conversation between her and Brinks.  Specifically, Nationwide asserts that

---

[12]     Nationwide had three lactation rooms at that time.  *See* Nationwide's Facts ¶ 65.

[13]     Ames asserts that Hallberg advised her not to express milk in a wellness room because her milk may be exposed to germs.  *See* Ames's App. at 7, p. 81:19–23.  Nationwide denies this allegation.  *See id.* at 31:1–13.

[14]     Ames disputes that Hallberg ever suggested that Ames could use her office to pump milk. *See* Ames's App. at 91 ¶ 15.

[15]     Ames alleges that Hallberg told her that the available wellness room was currently occupied by a sick person and "the lock . . . was broken, so if [Ames] wanted any semblance of privacy, [she] would need to put a chair against the door and sit in it while [she] pumped, so that anyone trying to come in would strike [her] chair with the door and hopefully be discouraged from entering. "  *See* Ames's App. at 91 ¶¶ 9–10.  Nationwide denies these allegations.  *See id.* at 31:14–20.

[16]     Brian Brinks was Ames's immediate supervisor.  *See* Nationwide's App. at 47, p. 10:16–19.

Ames's "work queue was up to date" when she came back to work on July 19, 2010.[17]  *See* Nationwide's App. at 52, p. 79:5–11.  Furthermore, Brinks testified that "[o]vertime was voluntary," and that Ames was not required to work overtime.  *See id.* at 52, p. 79:12–21.  Finally, Brinks denies telling Ames that he would start writing her up if she did not get caught up on her work within two weeks.  *See id.* at 52, pp. 80:15–81:5.

The unavailability of a lactation room, her urgent need to express milk, and Nationwide's "unrealistic and unreasonable expectations about her work production" caused Ames to resign from her position because she "felt like she had no other choice."  *See* Am. Compl. ¶ 44.  Ames sued the Nationwide Defendants alleging:  (1) sex and pregnancy discrimination under the Iowa Civil Rights Act ("ICRA"), *see* Am. Compl. ¶¶ 51–54; (2) pregnancy and sex discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), *see* Am. Compl. ¶¶ 55–58; and (3) violation of § 207 of the Fair Labor Standards Act ("FLSA"),[18] *see* Am. Compl. ¶¶ 59–64.  Ames contends that Hallberg, Neel, Brinks, and Somphong Baccam ("Baccam")[19] discriminated against her on the basis of sex, pregnancy, and nursing.  *See* Nationwide's App. at 86–93.

Specifically, Ames states that Hallberg discriminated against her by "providing a letter . . . stat[ing] there was a three-day waiting period . . . to access a lactation room," by offering her a wellness room, and by advising Ames that her "milk could not be guaranteed" if she used a

---

[17]     Actually, Nationwide states that Ames's "queue" was in much better condition when she returned to work as compared to when she went on maternity leave.  *See* Nationwide's Facts ¶ 74; Nationwide's App. at 52, p. 79:10–11; 213–58.

[18]     Ames calls this alleged violation of section 207 of the FLSA "nursing discrimination."  *See* Am. Compl. ¶ 1.

[19]     Baccam was the Nationwide disability case nurse assigned to Ames's case.  *See* Nationwide's Facts ¶ 61.

wellness room.  *See id.* at 87:11–23.  Neel subjected Ames to discrimination by "eye-rolling," by telling Ames that Neel did not have to go on bed rest during her pregnancy,[20] by stating that Neel would never have a baby shower before her baby is born because the baby could die, and because "[t]here was always a negative innuendo from [Neel] to [Ames.]"  *See id.* at 88:17–89:16.  With respect to Brinks, Ames complains that he viewed her pregnancy as an inconvenience, refused to help her lift a filing cabinet on one occasion, and made certain comments concerning Ames's maternity leave.[21]  *See id.* at 89:17–90:20.  Lastly, Ames contends that Baccam discriminated against her because Baccam had more information about Nationwide's lactation policy but did not share her knowledge with Ames, nor did she advise Ames to review the lactation policy on her own.  *See id.* at 93:14–23.

## II.  STANDARD FOR SUMMARY JUDGMENT

The term "summary judgment" is something of a misnomer.  *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010).  It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is

---

[20]     Ames testified that Neel made the following comments regarding Ames's pregnancy:  "'I never had this many problems when I was pregnant.  All I needed was a pocketful of Tums, and I was good to go.'"  Nationwide's App. at 92:15–17.  Ames also claims that Neel "comment[ed] on [her] size, about [her] carrying more than one baby because [she] was so big."  *Id.* at 92:17–19.

[21]     With respect to Brinks's alleged comments, Ames testified as follows:

> "Oh, yeah, I'm teasing her about only taking a week's worth of maternity leave. We're too busy for her to take off that much work."  And everyone would chime in with "Oh, yeah," you know, "she can only be gone for a week.  She already took her eight weeks with Henry."

Nationwide's App. at 90:13–18.

complicated, time-consuming, and expensive.[22]  *Id*. at 273, 281.  The complexity of the process, however, reflects the "complexity of law and life."  *Id*. at 281.  "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial.  *Id*. at 281–82.  Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[23]  *Id*. at 281.  Indeed, "judges are duty-bound to resolve legal disputes, no matter how close the call."  *Id*. at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances."  *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.*, 523 F.2d 891, 893 n.5 (8th Cir. 1975)).  The purpose of summary judgment is not "to cut litigants off from their right of trial by

---

[22]     Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial."  13 Green Bag 2d at 284.

[23]     Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment.  *Id*. at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627 (1944)).  While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement.  *See id*. at 283–88.

jury if they really have issues to try." *Poller v. Columbia Broad. Sys.*, *Inc.*, 368 U.S. 464, 467 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 627 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div.*, *Houdaille Indus.*, *Inc.*, 545 F.2d 1127, 1129 (8th Cir. 1976) (citing *Lyons v. Bd. of Educ.*, 523 F.2d 340, 347 (8th Cir. 1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 252 (1986); *Wilson v. Myers*, 823 F.2d 253, 256 (8th Cir. 1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weightwatchers of Quebec*, *Ltd. v. Weightwatchers Int'l*, *Inc.*, 398 F. Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 248. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed. R. Civ. P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.*; *Celotex*, 477 U.S. at 322–23; *Anderson*, 477 U.S. at 257. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248. "As to materiality, the substantive law will identify which facts are material . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249 and 10 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2712 (3d ed. 1998)).

### III.  LAW AND ANALYSIS

Defendants move for summary judgment on all three counts of Ames's Amended Complaint:  (1) sex and pregnancy discrimination in violation of the ICRA, *see* Am. Compl. ¶¶ 51–54; (2) sex and pregnancy discrimination in violation of Title VII, *see* Am. Compl. ¶¶ 55–58; and (3) violation of 29 U.S.C. § 207, *see* Am. Compl. ¶¶ 59–64.  *See* Br. in Supp. of Defs.' MSJ ("Nationwide's Br.") at 8–35.

### A.  *29 U.S.C. § 207(r)*

Returning to work promptly after childbirth, coupled with the desire to continue breast-feeding, exposes women to a unique and often challenging set of circumstances.  To many, expressing breast milk in the workplace is incompatible with the desire to pursue a successful career.  With respect to these challenges and the resulting social response, the Honorable Lewis A. Kaplan commented as follows:

> The transformation in the role of women in our culture and workplace in recent decades and the civil rights movement perhaps will be viewed as the defining social changes in American society in this century.  Both have resulted in important federal, state and local legislation protecting those previously excluded from important roles from discrimination in pursuit of the goal of equality.  Nevertheless, few would deny that the problems facing women who wish to bear children while pursuing challenging careers at the same time remain substantial.

*Martinez v. MSNBC*, 49 F. Supp. 2d 305, 306 (S.D.N.Y. 1999).  In *Martinez*, the plaintiff sued her employer for being "insufficiently accommodating of [her] desire to pump breast milk in the workplace so that she could breast[-]feed her child while also returning to work promptly after childbirth."  *Id.*

In the present case, Ames makes similar allegations.  Specifically, she claims that the Nationwide Defendants violated 29 U.S.C. § 207(r) by failing to provide her, on July 19, 2010,

"with reasonable time to express breast milk in a private location, free from intrusion and shielded from the view of the public or other employees, at the time necessary to express breast milk." Am. Compl. ¶ 60. Defendants respond by arguing that the FLSA does not provide a private cause of action to redress alleged violations of 29 U.S.C. § 207(r).[24] *See* Nationwide's Br. at 9. The Court agrees.

Although § 207(r) is relatively new,[25] at least one court has wrestled with the issue presently before the Court—whether the FLSA provides a private cause of action for violations of § 207(r). *See Salz v. Casey's Mktg. Co.*, No. 11-cv-3055, 2012 U.S. Dist. LEXIS 100399, at *6–7 (N.D. Iowa July 19, 2012). In holding that the FLSA does not provide a private cause of action, the Honorable Donald E. O'Brien reasoned as follows:

> The express breast milk provisions are codified at 29 U.S.C. § 207(r). 29 U.S.C. § 207(r) provides:
>
> > (r)(1) An employer shall provide—
> >
> > (A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and
> >
> > (B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.
> >
> > (2) An employer shall not be required to compensate an employee receiving reasonable break time under paragraph (1) for any work time spent for such purpose.
>
> The enforcement [provision] for violations of 29 U.S.C. § 207 [is] 29 U.S.C. §

---

[24]     Even if there was a private cause of action, the Nationwide Defendants maintain that they complied with 29 U.S.C. § 207(r). *See* Nationwide's Br. at 9.

[25]     29 U.S.C. § 207(r) was enacted on March 23, 2010.

216(b).  In pertinent part, 29 U.S.C. § 216(b) provides,

> Any employer who violates the provisions of section . . . 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

> Since Section 207(r)(2) provides that employers are not required to compensate employees for time spent express milking [*sic*], and Section 216(b) provides that enforcement of Section 207 is limited to unpaid wages, there does not appear to be a manner of enforcing the express breast milk provisions.  A recent notice from the Department of Labor corroborates Defendant's interpretation and limits an employee to filing claims directly with the Department [of] Labor.  Reasonable Break Time for Nursing Mothers, 75 Fed. Reg. 80073, 80078 (Dec. 21, 2010).  The Department of Labor may then "seek injunctive relief in federal district court . . . ."

*Id.*  Although *Salz* does not constitute binding authority, the Court finds its logic irrefutable and, accordingly, adopts its holding.[26]  Therefore, since Ames cannot bring a claim for any alleged violation of 29 U.S.C. § 207(r), the Court grants summary judgment for Defendants.

B.  *Sex, Pregnancy,[27] and Nursing[28] Discrimination*

---

[26]    Since the Court holds that the FLSA does not provide a private cause of action to remedy alleged violations of § 207(r), the Court need not decide whether, on July 19, 2010, the Nationwide Defendants complied with this provision.

[27]    Under the Pregnancy Discrimination Act ("PDA"), pregnancy discrimination falls within the scope of, and is a type of, gender discrimination.  *See Falk v. City of Glendale*, No. 12-cv-00925, 2012 U.S. Dist. LEXIS 87278, at *8 n.5 (D. Colo. June 25, 2012).  Therefore, the Court will analyze Ames's claims for pregnancy and gender discrimination as a single claim.  *See id.*

[28]    Ames argues that she is a member of a protected class—that of lactating mothers.  *See* Pl.'s Resistance Br. at 17–23.  In support, Ames argues that lactation is a medical condition related to her pregnancy.  *See id.* at 17–18 (citing 42 U.S.C. § 2000e(k)).  Several courts, however, have considered and rejected the argument that terminating an employee due to lactation is gender or pregnancy discrimination.  *See EEOC v. Houston Funding II, Ltd., et al.*, No. H-11-2442, 2012 U.S. Dist. LEXIS 13644, at *3–4 (S.D. Tex. Feb. 2, 2012) ("Firing someone because of lactation or breast-pumping is not sex discrimination.") (collecting cases).

In disputing the soundness of these cases' legal analyses, Ames relies primarily on *Falk*.

Ames argues that the record in this case contains direct and circumstantial evidence that the Nationwide Defendants illegally discriminated against her in violation of Title VII and the ICRA.  *See* Pl.'s Br. in Supp. of Resistance to Defs.' MSJ ("Pl.'s Resistance Br.") at 14–30.  Defendants disagree and assert that, on the present record, summary judgment is appropriate

---

*See* Pl.'s Resistance Br. at 19–20.  After providing an overview of existing case law surrounding lactation, the *Falk* court summarized:

> As it stands, no existing case law correctly excludes lactation or other conditions experienced by the mother as a result of breast-feeding from Title VII protection under the PDA.  *A plaintiff could potentially succeed on a claim if she alleged and was able to prove that lactation was a medical condition related to pregnancy, and that this condition, and not a desire to breastfeed, was the reason for the discriminatory action(s) that she suffered.*

*Falk*, 2012 U.S. Dist. LEXIS 87278, at *13 n.7 (emphasis added).  Ames has not presented sufficient evidence that lactation is a medical condition related to pregnancy.  Indeed, as the Nationwide Defendants point out, "lactation can be induced by stimulating the body to produce milk even though the person has not experienced a recent birth or pregnancy."  Defs.' Reply Br. in Supp. of MSJ ("Nationwide's Reply Br.") at 12 n.9.  Additionally, the Court takes judicial notice of the fact that adoptive mothers can also breast-feed their adoptive babies.  *See* Defs.' App. at 323–25 (stating that adoptive mothers can breast-feed their adoptive babies and describing what adoptive mothers should do to stimulate milk production).  Furthermore, it is a scientific fact that even men have milk ducts and the hormones responsible for milk production.  *See* Nikhil Swaminathan, *Strange but True:  Males Can Lactate*, Sci. Am., Sept. 6, 2007, *available at* http://www.scientificamerican.com/article.cfm?id=strange-but-true-males-can-lactate&sc=rss.
 Accordingly, lactation is not a physiological condition experienced exclusively by women who have recently given birth.

Assuming, *arguendo*, that Ames had presented sufficient evidence that lactation was a medical condition related to pregnancy, the Court is doubtful that she has presented enough facts to establish that her alleged constructive discharge was due to her medical condition (lactation) rather than due to her desire to breast-feed.  *See Falk*, 2012 U.S. Dist. LEXIS 87278, at *13 n.7.  Indeed, Ames's Amended Complaint contains several references to her desire to pump milk as a form of nutrition for her newborn son.  *See* Am. Compl. ¶¶ 22–23, 32, 42, 45.  As Falk held, however, "Title VII does not extend to breast-feeding as a child care concern."  *Falk*, 2012 U.S. Dist. LEXIS 87278, at *10.

because: (1) Ames has not presented direct evidence of sex, pregnancy, or nursing discrimination; and (2) Ames has not presented sufficient circumstantial evidence to establish a prima facie case of sex, pregnancy, or nursing discrimination. *See generally* Nationwide's Br. at 13–35; Defs.' Reply Br. in Supp. of MSJ ("Nationwide's Reply Br.") at 7–19.

Federal case law supplies the basic framework for deciding cases under the ICRA. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1380 (8th Cir. 1996) (citing *Iowa State Fairgrounds Sec. v. Iowa Civil Rights Comm'n*, 322 N.W.2d 293, 296 (1982)). Iowa courts "traditionally turn to federal law for guidance on evaluating the ICRA, but federal law . . . is not controlling." *Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (citations omitted). Neither party posits any separate legal arguments regarding Ames's ICRA claim. The Court, therefore, will address Ames's federal and state law claims of sex, pregnancy, and nursing discrimination together.

The analytical framework for discrimination claims under Title VII uses two separate frameworks to determine whether a plaintiff was subject to discrimination. The choice between the two analyses depends on whether a plaintiff presents direct evidence of the alleged discrimination, thereby warranting a "mixed motive" theory of analysis as explained in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirect or circumstantial evidence of the alleged discrimination which requires a "burden-shifting" framework of analysis under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1.    *Direct evidence.*

If a plaintiff produces direct evidence of the alleged discrimination, the plaintiff must persuade the fact-finder under the "mixed motive" theory of analysis. The plaintiff must persuade the fact-finder that, more likely than not, discrimination was "a motivating part in an

employment decision." *Price Waterhouse*, 490 U.S. at 254. The burden then "shifts to the employer to prove that the employment decision would nevertheless have been made for legitimate, nondiscriminatory reasons." *Yates v. McDonnell-Douglas*, 255 F.3d 546, 548 (8th Cir. 2001). Direct evidence of discrimination has been defined by the Eighth Circuit as "evidence or conduct or statements by persons involved in the decision-making process that is sufficient for the fact-finder to find that a discriminatory attitude was more likely than not a motivating factor in the employers' decision." *Kerns v. Capital Graphics, Inc.*, 178 F.3d 1011, 1017 (8th Cir. 1999). The Eighth Circuit goes on to state that "such evidence might include proof of an admission that gender was the reason for an action, discriminatory references to the particular employee in a work context, or stated hostility to women being in the workplace at all." *Id.*; *see also Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir. 1991) ("[D]irect evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude[,] . . . [c]omments which demonstrate a 'discriminatory animus in the decisional process[,]' . . . or those uttered by individuals closely involved in employment decisions." (citations omitted)). "[S]tray remarks in the workplace, statements by nondecisionmakers, [and] statements by decisionmakers unrelated to the decisional process itself are not, however, direct evidence of discrimination." *See Beshears*, 930 F.2d at 1354 (citing *Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring)) (internal quotation marks omitted).

In 1976, the U.S. Supreme Court held that pregnancy discrimination was not gender discrimination. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125 (1976). In response to *Gilbert*, in 1978, Congress passed the Pregnancy Discrimination Act ("PDA"). *See Falk*, 2012 U.S. Dist. LEXIS 87278, at *9. The PDA amended Title VII by extending gender discrimination to include

discrimination on the basis of pregnancy, childbirth, or related medical conditions.  *See id.* at *10

(citing 42 U.S.C. § 2000e(k)); *see also Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 341 (8th

Cir. 1997).  Currently, the relevant section reads, in part, as follows:

> The terms "because of sex" or "on the basis of sex" include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work.

42 U.S.C. § 2000e(k).

Ames argues that she has direct evidence of gender discrimination.  *See* Pl.'s Resistance

Br. at 14–17.  This direct evidence is the following comment that Neel allegedly made to Ames

"at the exact same time she was handing [Ames] a piece of paper and telling her what she needed

to write down in order to resign":  "'Maybe you should just stay home with your babies.'"  *See*

*id.* at 15.  Neel denies making this comment.  *See* App. to Defs.' MSJ ("Nationwide's App.") at

287, pp. 87:25–88:12.  Assuming, *arguendo*, that Neel did indeed make this comment, the Court

finds that, under Eighth Circuit law, it does not constitute direct evidence of discrimination.

In arguing to the contrary, Ames relies primarily on *Sheehan v. Donlen Corp.*, 173 F.3d

1039 (7th Cir. 1999).  *See* Pl.'s Resistance Br. at 16.  In *Sheehan*, contemporaneously with telling

the plaintiff that she was terminated, her supervisor added:  "Hopefully this will give you some

time to spend at home with your children."  *See Sheehan*, 173 F.3d at 1043.  The next day, the

supervisor also told the plaintiff's co-workers that she had been terminated because "'we felt that

this would be a good time for [Sheehan] to spend some time with her family.'"  *Id.*  The *Sheehan*

court held that a reasonable jury could conclude that these comments were direct evidence of

pregnancy discrimination.  *See id.* at 1044.

*Sheehan* does not automatically compel the conclusion that Ames has mounted direct evidence of discrimination, however.  To determine whether the comment at issue in this case constitutes direct evidence of sex discrimination, under Eighth Circuit law, the Court must analyze the speaker, the comment's content, and the causal connection between the comment and the adverse employment action.  *See Wensel v. State Farm Mut. Auto. Ins. Co.*, 218 F. Supp. 2d 1047, 1059 (N.D. Iowa 2002) (citing *Bauer v. Metz Baking Co.*, 59 F. Supp. 2d 896, 901–06 (N.D. Iowa 1999)).

> a.     *The speaker.*

To constitute direct evidence of prohibited discrimination, the comment must be made by someone "involved in the decisionmaking process" and must concern the adverse employment action.  *See Wensel*, 218 F. Supp. 2d at 1059 (internal citations and quotation marks omitted).  It is not necessary, however, that the speaker be the "final decisionmaker."  *See id.*  At all relevant times,  Neel was the Associate Vice President, who oversaw the Loss Mitigation Department, where Ames worked.  *See* Nationwide's Facts ¶ 5; Nationwide's App. at 54, p. 10:13–25.  Therefore, a reasonable fact-finder could infer that Neel was certainly involved in the alleged decision to force Ames into resigning from her position.

> b.     *The content of the comment.*

Only comments by decision-makers that are "*sufficient for a fact[-]finder to find that a discriminatory attitude was more likely than not a motivating factor in the employer's deicion*" would rise to the level of direct evidence of discrimination.  *See Wensel*, 218 F. Supp. 2d at 1059–60 (citing *Metz Baking Co.*, 59 F. Supp. 2d at 904) (internal quotation marks omitted)

17

(emphasis in original).

The Court finds that, under Eighth Circuit law, "Maybe you should just stay home with your babies" does not constitute direct evidence of sex discrimination. Rather, this comment is based on Ames's gender-neutral status as a new parent. *See Piantanida*, 116 F.3d at 342. "[D]iscrimination based on one's status as a new parent is not prohibited by the PDA." *Id.* at 341. In *Piantanida*, the court held, in the context of demoting the plaintiff, that the employer's statement that "she was being given a position 'for a new mom to handle'" was not direct evidence of gender discrimination.[29] *Id.* Similarly, in *Wensel*, the court held that the defendant's statements[30] regarding the effect of child-rearing on insurance agents' productivity were gender-

---

[29] During her deposition, the *Piantanida* plaintiff conceded that her demotion was not related to her pregnancy or maternity. *See Piantanida*, 116 F.3d at 341. Thus, the district court analyzed her Title VII claim as a gender discrimination claim "on the basis of her status as a 'new mother.'" *See Piantanida*, 927 F. Supp. at 1230 n.1. Although it is axiomatic that only women can be "new mom[s]," the Eighth Circuit nevertheless held that the comment at issue was gender-neutral. *See Piantanida*, 116 F.3d at 342.

Ames, however, argues that "Maybe you should just stay home with your babies" is not a gender-neutral comment, but rather one that "invoke[s] widely understood stereotypes the meaning of which is hard to mistake." *See* Pl.'s Resistance Br. at 16 (citing *Sheehan*, 173 F.3d at 1044–45 (internal quotation marks omitted)). The *Sheehan* court held that the following two comments constituted direct evidence of gender discrimination because they invoked "widely understood stereotypes" regarding women's ability to balance work and child-rearing: (1) "Hopefully this will give you some time to spend at home with your children"; and (2) "we felt that this would be a good time for [the plaintiff] to spend some time with her family." *See Sheehan*, 173 F.3d at 1043. Indeed, on the authority of *Sheehan*, one would be hard-pressed to argue that either the comment in *Piantanida* or Neel's alleged comment in this case do not invoke such stereotypes. *Sheehan*, however, is not binding on the Court while *Piantanida* is. Accordingly, the Court is compelled to follow *Piantanida* and hereby holds that "Maybe you should just stay home with your babies" is a gender-neutral comment that does not support Ames's claim for gender discrimination.

[30] There were two statements at issue in *Wensel*: "(1) that Wensel should wait at least five years before starting a family; and (2) that pregnancy and child-rearing harm an agent's ability to meet his or her productivity goals." *Wensel*, 218 F. Supp. 2d at 1060.

neutral and, therefore, not direct evidence of gender discrimination. *See Wensel*, 218 F. Supp. 2d at 1061–62.

In light of *Piantanida* and *Wensel*, the Court must conclude that "Maybe you should stay home with your babies" is, at best, evidence of discrimination on the basis of Ames's status as a new parent. Being a parent is not gender-specific as this class also includes men and women who will never become pregnant. *See Piantanida*, 116 F.3d at 342. Accordingly, since discriminating against Ames on account of her status as a parent would not be discrimination "because of or on the basis of [her] pregnancy, childbirth, or related medical conditions," the Court finds that no reasonable fact-finder could conclude that the alleged comment constitutes direct evidence of gender discrimination.

c.     *Causal connection.*

Since the Court has determined that no reasonable jury could conclude that the comment Ames cites is direct evidence of sex discrimination, the Court need not decide whether there was causation between the alleged comment and Ames's alleged constructive discharge.

Accordingly, since no reasonable fact-finder could conclude that the comment at issue, assuming it was uttered by Neel, constitutes direct evidence of sex discrimination, the Court now turns to the *McDonnell Douglas* framework to analyze any purported circumstantial evidence of sex discrimination.

2.     *Circumstantial evidence.*

Where a plaintiff relies on circumstantial, rather than direct, evidence of intentional discrimination, the court applies the three-stage burden shifting approach developed by the Supreme Court in *McDonnell-Douglas*, and later refined in *Texas Dep't of Cmty. Affairs v.*

*Burdine*, 450 U.S. 248 (1981); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Dammen v. UniMed Med. Ctr.*, 236 F.3d 978, 980 (8th Cir. 2001).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802. If the plaintiff establishes a prima facie case, the burden of production shifts at the second stage to the defendant, who must articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Burdine*, 450 U.S. at 253. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case." *Id*. at 255 n.10. The burden then shifts back at the third and final stage to the plaintiff, who is given the opportunity to show that the employer's proffered reason was merely a pretext for discrimination. *Id*. at 253. The ultimate burden remains with the plaintiff at all times to persuade the trier of fact that the adverse employment action was motivated by intentional discrimination. *Id*.

To establish a prima facie case of sex discrimination, Ames must show that: (1) she is a member of a protected class;[31] (2) she met applicable job qualifications; (3) despite her

---

[31]    Defendants dispute that Ames is a member of a protected class. *See* Nationwide's Br. at 16–18. Although this Order does not specifically address this prong of Ames's prima facie case, the Court finds Defendants' argument persuasive. Ames appears to assert a protected status on the basis of her pregnancy and lactation. *See* Pl.'s Resistance Br. at 17–23. To the extent that Ames asserts a protected status on the basis of lactation, the Court finds she has failed to show that she belongs to a protected class because lactation is not pregnancy, childbirth, or a related medical condition. *See supra* n. 28; *see also* 42 U.S.C. § 2000e(k). To the extent that she claims a protected status on the basis of her pregnancy, the Court notes that Ames has not put forth sufficient evidence that there was a connection between Defendants' alleged discriminatory comments and conduct and Ames's alleged constructive discharge. *See Neesen v. Arona Corp.*, 708 F. Supp. 2d 841, 850 (N.D. Iowa 2010) (stating that the PDA does not apply "exclusively to women who are pregnant or suffer from a pregnancy-related disability" but that the alleged

qualifications, she suffered an adverse employment action; and (4) the circumstances permit an

inference of discrimination. *See Lewis v. Heartland Inns of Am., LLC*, 591 F.3d 1033, 1038 (8th

Cir. 2010). "The burden of establishing a prima facie case of disparate treatment is not onerous."

*Burdine*, 450 U.S. at 253. The *McDonnell Douglas* framework for establishing a prima facie

case of illegal discrimination "was never intended to be rigid, mechanized, or ritualistic."

*Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). This framework's central focus is to

determine whether the employer has treated some employees less favorably than others for an

impermissible reason. *See id.*

The Nationwide Defendants concede, for purposes of summary judgment, that Ames was

qualified for her position as a loss mitigation specialist. *See* Nationwide's Br. at 15. They

dispute, however, that Ames suffered an adverse employment action under circumstances

permitting an inference of discrimination.

       a.     *Adverse employment action.*

Constructive discharge is a type of an adverse employment action. *See Smith v. Lake

Ozark Fire Dist.*, No. 10-cv-4100, 2011 U.S. Dist. LEXIS 64722, at *22–23 (W.D. Mo. June 13,

2011) (citing *Farcello v. County of Ramsey*, 612 F.3d 1069, 1083 (8th Cir. 2010)). "The bar to

relief [in constructive discharge cases], however, is high." *Farcello*, 612 F.3d at 1083 (citing

*O'Brien v. Dep't of Agric.*, 532 F.3d 805, 810–11 (8th Cir. 2008)). To prevail on her

constructive discharge claim, Ames must establish that: (1) a reasonable person would find her

working conditions at Nationwide intolerable; and (2) Nationwide intended to force her to resign

---

discrimination must be "because of or on the basis of pregnancy").

from her employment or could have "reasonably foreseen" that she would resign. *See id.* (internal citation omitted). Ames must also establish that she gave the Nationwide Defendants a reasonable chance to resolve the issues. *See West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995) ("Part of an employee's obligation to be *reasonable* is an obligation not to assume the worst and not to jump to conclusions too fast . . . . An employee who quits without giving her employer a reasonable chance to work out a problem is not constructively discharged.") (emphasis in original) (internal quotation marks omitted)).

Whether an employee has been constructively discharged is judged by an objective standard. *See Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 869 (8th Cir. 2008) ("[A] constructive discharge takes place only when a reasonable person would find [the] working conditions intolerable."). "Unpleasant [or] unprofessional [work] environment" is insufficient to establish a constructive discharge. *Jones v. Fitzgerald*, 285 F.3d 705, 716 (8th Cir. 2002) (declining to find that the plaintiff had been constructively discharged even though two of her co-workers had called her a "skank," made harsh comments concerning her cohabitation with a man to whom she was not married, exhibited hostile attitudes, stuck their tongues out at her, "whisper[ed] in hushed voices in her presence, abruptly ceas[ed] conversations in her presence," and socially isolated her). Work atmosphere that is less than ideal will not, by itself, support a successful constructive discharge claim because such atmosphere would not compel a reasonable person to resign. *See Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999).

      i.     *Intolerableness of working conditions.*

At trial, Ames would bear the burden of showing that a reasonable person[32] would have found her working condition intolerable, thus leaving her no choice but to quit. *See Wensel*, 218 F. Supp. 2d at 1064 (internal citations omitted). In support of her claim of intolerable conditions, Ames relies on the following factors: (1) she was not given *immediate* access to a lactation room on July 19, 2010; (2) at the time she resigned, "it had been over *five hours* since she had last expressed milk and [she] was in considerable physical pain"; and (3) during her meeting with Brinks, he allegedly told her that none of her work had been done during her maternity leave, that she had to work overtime to get caught up, and that if Ames did not catch up within two weeks, she would be disciplined. *See* Pl.'s Resistance Br. at 24–27. Although not specifically set forth in her resistance brief, in arguing that she was constructively discharged, Ames seems to also rely on the following allegations: (4) Neel asked her to return to work on July 19, 2010 rather than the originally provided date of August 2, 2010; (5) Defendants did not provide her with information regarding Nationwide's lactation policy; and (6) Neel, Brinks, Baccam, and Hallberg discriminated against her during and after her pregnancy. *See* Nationwide's Br. at 16.

---

[32] Ames urges that the reasonable person standard applicable to her constructive discharge claim must account for the following factors: (1) the day she resigned was her first day back to work following the birth of her second child; (2) "she [was] battling the array of hormones common in a woman eight weeks post-partum"; (3) she was lactating and her breasts were engorged "from not being allowed to express milk"; and (4) she was excited to return to work but also sad to leave her newborn in somebody else's care. *See* Pl.'s Resistance Br. at 24. The Court disagrees with Ames's contention as adopting it would effectively transform the objective test into a subjective one. *See Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) ("[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge."); *Angier v. Henderson*, No. 00-215, 2001 U.S. Dist. LEXIS 15310, at *18 n.3 (D. Minn. Aug. 3, 2010) ("[W]hen analyzing the merits of a constructive discharge claim, the fact[-]finder does not evaluate the workplace from the subjective viewpoint of the plaintiff.").

After analyzing the substance of these factors, the Court finds that they revolve around four common themes: (1) the alleged discrimination; (2) the revised return-to-work date; (3) Nationwide's lactation policy; and (4) the job expectations following Ames's return from maternity leave. Even if all of these factors were present, as Ames insists, the Court finds that they would still be insufficient to induce a reasonable fact-finder to conclude that Ames's working conditions were intolerable.

a)      *Alleged discrimination.*

Ames maintains that Neel, Brinks, Hallberg, and Baccam subjected her to discrimination. Neel allegedly discriminated against Ames by "eye-rolling," by telling Ames that she did not have to go on bed rest during her pregnancy, by stating that she would never have a baby shower before her baby is born because the baby could die, and because "[t]here was always a negative innuendo from her to [Ames.]" *See* Nationwide's App. at 88:17–89:16. Ames testified that Neel also commented regarding Ames's pregnancy as follows: "'I never had this many problems when I was pregnant. All I needed was a pocketful of Tums, and I was good to go.'" *Id.* at 92:15–17. Furthermore, Neel allegedly "comment[ed] on [Ames's] size, about [Ames's] carrying more than one baby because [she] was so big." *Id.* at 92:17–19.

With respect to Brinks, Ames complains that he viewed her pregnancy as an inconvenience, refused to help her lift a filing cabinet on one occasion, and made certain comments concerning her maternity leave. *See id.* at 89:17–90:20. Specifically, at her deposition, Ames testified as follows regarding Brinks's alleged comments:

> "Oh, yeah, I'm teasing her about only taking a week's worth of maternity leave. We're too busy for her to take off that much work." And everyone would chime in with "Oh, yeah," you know, "she can only be gone for a week. She already took her

eight weeks with Henry."

*Id.* at 90:13–18.

Next, Ames alleges that Hallberg discriminated against her by "providing a letter . . . stat[ing] there was a three-day waiting period . . . to access a lactation room," by offering her a wellness room to pump milk, and by advising Ames that her "milk could not be guaranteed" if she uses a wellness room. *See id.* at 87:11–23. Lastly, Ames contends that Baccam discriminated against her because Baccam had more information about Nationwide's lactation policy, but did not share her knowledge with Ames and did not advise Ames to review the lactation policy on her own. *See id.* at 93:14–23.

The Court finds that a reasonable fact-finder would conclude that, objectively, these instances of alleged discrimination would not cause a reasonable person in Ames's position to believe that she had no choice but to resign. Applying the reasonable person standard, the Court concludes that, at most, the comments and conduct at issue created a less than ideal and, arguably, unpleasant work environment for Ames. As held by the *Jones* and *Breeding* courts, however, this is insufficient to cause a reasonable person to believe that she has no choice but to resign. Furthermore, the Court notes that the facts of the present case paint a picture far less reprehensible than the one in *Jones*, where the Court declined to find that the plaintiff had been constructively discharged.

Although a reasonable fact-finder would conclude that Neel's and Brinks's comments were insufficient for a successful constructive discharge claim, the Court believes that these comments at least allow Ames to raise a colorable constructive discharge claim. The same cannot be said for Hallberg's and Baccam's alleged discriminatory conduct. Ames complains

25

that Hallberg discriminated against her by providing her with a letter stating that there was a three-day waiting period before obtaining access to a lactation room and by offering Ames use of a wellness room in the meantime.  What Ames finds objectionable and discriminatory in Baccam's conduct is her failure to voluntarily and on her own initiative inform Ames of the contents of Nationwide's lactation policy.  A reasonable fact-finder would not conclude that this constitutes culpable conduct.  Therefore, the Court holds, as a matter of law, that neither Hallberg nor Baccam contributed to the alleged intolerable working conditions.

b)      *Revised return-to-work date.*

Ames contends that having to report back to work two weeks prior to the originally scheduled return date of August 2, 2010 created or at least contributed to creating intolerable work conditions.  The Court disagrees.  It is undisputed that Ames was originally told that she could remain on maternity leave[33] until August 2, 2010.  *See* Nationwide's App. at 204.  On June 16, 2010, however, Neel informed her in a telephone call that the August 2, 2010 date had been incorrectly calculated.[34]  *See id.*  Before ending the phone call, Ames and Neel agreed that Ames would return to work on July 19, 2010.  *See id.*  Notably, Ames acknowledged that returning to work on July 19, 2010 would be "fine."[35]  *See id.*

---

[33]      The Court refers to the leave provided to new mothers by the Family Medical Leave Act ("FMLA") as maternity leave.

[34]      Neel explained that the maternity leave authorized by the FMLA is calculated on a rolling twelve-month basis.  *See* Nationwide's App. at 204.  Ames was not entitled to the full FMLA leave following the birth of her second child because she had already used some FMLA leave during the preceding twelve months due to the birth of her first child.  *See id.*

[35]      The Court notes that Ames agreed to return to work on July 19, 2010 before Neel stated that remaining on maternity leave until August 2, 2010 would "cause[] red flags . . . and problems like that."  *See* Nationwide's App. at 204.

There is no doubt that reporting back to work sooner than expected came as a shock to Ames. *See id.* The Nationwide Defendants, however, had a legitimate reason for requiring Ames to do so—the length of her maternity leave had been miscalculated. *See id.* Defendants did not deprive Ames of her rights under the Family Medical Leave Act (the "FMLA"). To the contrary, they extended Ames's maternity leave by one week. *See id.* In light of this extension, the fact that Defendants did not prejudice Ames's rights under the FMLA, and the fact that Ames had more than thirty days to prepare for returning to work on July 19, 2010, the Court concludes that, in the eyes of a reasonable fact-finder, the June 16, 2010 telephone call would not lead a reasonable person in Ames's position to believe that she had no choice but to resign.

c)    *Lactation policy and lactation room access.*

It is undisputed that Ames could not have been given access to a lactation room on July 19, 2010 because she had not filled out the required paperwork beforehand. *See supra* n.11. It is also undisputed, however, that Ames was able to use one of the wellness rooms to pump milk that day.[36] *See* Nationwide's App. at 73:4–8. Even if Ames did not consider the wellness rooms a satisfactory accommodation, using a wellness room was only a temporary solution until she was granted access to a lactation room. *See* Ames's App. at 7, p. 81:16–19 ("[T]here was a three-day waiting period for [Ames] to access a lactation room.").

Furthermore, although Ames refuses to accept any blame for not familiarizing herself with Nationwide's lactation policy, the fact remains that the policy was readily available to her. *Compare* Nationwide's App. at 87, p. 93:11–23 (Ames stating that Baccam discriminated against

---

[36]    Prior to creating the three lactation rooms, nursing mothers used the wellness rooms to express milk. *See* Ames's App. at 31:1–4.

her by not explaining Nationwide's lactation program) *with* Nationwide's App. at 81:5–14; 84:14–85:16; 93:14–23 (Ames admitting that Nationwide's lactation policy was available on the company intranet, that she could have obtained information regarding the lactation policy during one of the quarterly maternity meetings but never attended any of those meetings because of her workload, and that she could have asked Baccam how to arrange for a lactation room access before returning to work). Even if Ames's workload was indeed so heavy that she could not attend any of the quarterly maternity meetings, she certainly could have reviewed Nationwide's lactation policy at some time during her pregnancy or during her maternity leave following the birth of her second child.[37] Similarly, prior to returning to work, Ames could have asked Baccam any questions concerning Nationwide's lactation policy, including how to obtain access to a lactation room, but did not do so.

A reasonable person in Ames's position would have done what is necessary to familiarize herself with Nationwide's lactation policy before returning to work. After all, going back to work did not come as a surprise to Ames; she knew on June 16, 2010 that she had to report back to work on July 19, 2010. Thus, she had over a month to prepare. The Court is not insensitive to the burdens and stresses associated with parenthood, particularly those experienced by new mothers. Being under stress, however, does not excuse Ames from doing what any reasonable person in her position would have done. Therefore, the Court concludes that no reasonable fact-finder would determine that the unavailability of a lactation room on July 19, 2010 would lead a reasonable employee in Ames's position to believe that her only option was to resign. *See*

---

[37]    The Court notes that Nationwide's lactation policy is approximately three pages long. *See* Nationwide's App. at 148, 150–51.

*Jerkovich v. Freson-Madera of Am. Red Cross*, No. CV-F-04-5811, 2005 U.S. Dist. LEXIS 44827, at *52 (E.D. Cal. Aug. 23, 2005) ("Plaintiff was provided a secure and private place for her lactation needs[, albeit an unsanitary computer room]; even if less than ideal, this accommodation would not prompt a reasonable employee to believe that her only option was to quit.").

### d)    *Job expectations.*

Similarly, regardless of the contents of the July 19, 2010 conversation between Ames and Brinks, no reasonable jury would find that a reasonable employee in Ames's position would believe that her only option was to resign.  Ames alleges that, during that meeting, Brinks told her that none of her work had been done while she was on maternity leave,[38] that she had two weeks to catch up, and that she had to work overtime to do so.  *See* Ames's App. at 91 ¶¶ 11–12.  Also, Brinks allegedly told Ames that she would be formally disciplined unless she was completely caught up on her work in two week's time.  *See id.* ¶ 12.  Even assuming that Brinks indeed made these statements, the Court determines that no reasonable jury would conclude that

---

[38]    Ames asserts that Brinks told her that none of her work had been done while she was on maternity leave and that she had two weeks to catch up on all the work that had been piling up.  *See* Ames's App. at 43.  Brinks disputes that none of Ames's work had been done.  *See* Ames's App. at 27, pp. 79:22–80:10.  Ames's assertion is also contradicted by Nationwide's reports showing that, as of July 19, 2010, Ames's work queue was in a better condition than when she took her maternity leave.  *See* Nationwide's App. at 213–58.  The parties' disagreement on this issue does not create a genuine dispute.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that a "metaphysical doubt" does not create a genuine dispute); *see also Middleton v. Am. Standard Cos.*, No. 06-2205, 2007 U.S. Dist. LEXIS 69733, at *28 (W.D. Ark. Sept. 20, 2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

these job expectations created intolerable working conditions, such that a reasonable person in Ames's position would believe that she had no option but to quit.  Completing work assignments in a timely manner is not an unique job requirement; rather, it is central to the proper functioning of any business, including Nationwide's.  *See* Nationwide's App. at 48, p. 15:11–19.  Indeed, timely completion of the work tasks was a key characteristic of the position of loss mitigation specialist, and was "a high priority" within the entire Loss Mitigation Department.  *See id.* at 48, p. 15:11–19.  Thus, the mere expectation that Ames must timely perform her job duties, without more, cannot convince a reasonable fact-finder that Ames endured intolerable work conditions forcing her to resign.

ii.    *Foreseeability of Ames's resignation.*

Ames has not put forth any evidence, other than her self-serving and unsupported assertion, that the Nationwide Defendants intended for her to resign on July 19, 2010.  *See* Pl.'s Resistance Br. at 27 ("[The Nationwide Defendants *intended* for [Ames] to resign on July 19, 2010." (emphasis in original)).  Accordingly, on this record, the Court must conclude that no reasonable fact-finder would determine that Defendants intended for Ames to quit.  Thus, the relevant inquiry becomes whether it was reasonably foreseeable to Defendants that Ames would resign.  The Court must answer this question in the negative.

No reasonable jury would agree that it was reasonably foreseeable to Defendants that the alleged discriminatory comments and conduct of Neel, Brinks, Hallberg, and Baccam would cause Ames to resign.  As articulated in § III.B.2.a.i.a), the Court has determined that no reasonable jury would find Hallberg's and Baccam's conduct even remotely objectionable.  Furthermore, for the reasons stated in that section, the Court finds that, although a reasonable

fact-finder may conclude that Neel's and Brinks's comments were distasteful and inappropriate, it was nevertheless not reasonably foreseeable that those comments would force Ames to resign.

Similarly, no reasonable jury would find it reasonably foreseeable that changing Ames's return-to-work date would promote her ultimate resignation. Defendants asked Ames to report back to work earlier than expected because they had miscalculated the length of the maternity leave to which she was entitled. Therefore, all that they expected of Ames was to comply with the applicable FMLA provisions.

With respect to Ames's assertion that she was not given access to a lactation room, the Court notes that she had not filled out the required paperwork prior to reporting back to work on July 19, 2010. Her failure to do so is the *sole* reason for not getting access to a lactation room on that day. By not requesting such access, Ames failed to notify the Nationwide Defendants of her intentions to continue breast-feeding past the expiration of her maternity leave. Accordingly, it was not reasonably foreseeable that Ames would resign simply because she could not have access to a lactation room on July 19, 2010, or because she had to wait three days before getting access to such a room. The Court also finds that it was similarly not reasonably foreseeable that Ames would resign because she had to use a wellness room to express milk until obtaining access to a lactation room. Finally, for the reasons articulated in § III.B.2.a.i.d), a reasonable jury would not find that it was reasonably foreseeable that Ames would resign because of the expectation that she needed to maintain her work queue current.

iii. *Opportunity to respond.*

To prevail on her constructive discharge claim, Ames must show that she refrained from "assum[ing] the worst" and provided Defendants with an opportunity to address her grievances.

*See West*, 54 F.3d at 498; *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998).

Ames argues, and the Court will assume for purposes of this Order, that she did so when she "tried to discuss her feelings of despair with Ms. Neel and explore any options that might be available to her to accommodate her need to provide breast milk for her son." *See* Am. Compl. ¶ 45; *see also* Pl.'s Resistance Br. at 29. It is undisputed that Ames did not lodge a complaint with Nationwide's Human Resources department, the Office of Ethics, or the Office of Associate Relations.[39] *See* Nationwide's App. at 96:2–18. For this reason, the Court concludes, as a matter of law, that Ames did not give Defendants an opportunity to respond to her grievances.

*Sowell v. Alumina Ceramics, Inc.* presents a similar to this case's fact pattern. *See* 251 F.3d 678 (8th Cir. 2001). The plaintiff in *Sowell*, who had recently given birth to her child, complained to her supervisor regarding the newly-instituted pager policy but "failed to avail herself of the channels of communication provided by [the employer] to deal with such complaints." *See Sowell*, 251 F.3d at 385–86 (internal citation omitted). The Eighth Circuit affirmed the district court's grant of summary judgment for the employer, in part, due to Sowell's failure to utilize the grievance process established by the employer. *See id.*

---

[39]     Nationwide's Compliance Statement reads as follows:

> If you have reason to believe that Nationwide is not in compliance with the law, contact your local HR professional, the Office of Ethics, or the Office of Associate Relations to report the circumstances immediately. All complaints will be investigated and handled in as confidential a manner as possible. You are assured that there will be no retaliation against you for participating in an investigation or making a complaint with the reasonable belief that non-compliance with the law has occurred.

Nationwide's App. at 105. Ames was undoubtedly aware of this policy. *See id.* at 195.

Using similar reasoning, in *Coffman*, the Eighth Circuit reversed the jury's finding that the plaintiff had been constructively discharged. *See Coffman*, 141 F.3d at 1247–48. In concluding that there was insufficient evidence to support such a finding, the court took into account the fact that the plaintiff had available avenues for redress within the company but failed to use them. *See id.* The court explained that the rationale behind requiring an employee to attempt to resolve her grievances internally is that "society and the policies underlying Title VII will be best served if, wherever possible, unlawful discrimination is attacked within the context of existing employment relationships." *Id.* at 1247 (internal citations and quotation marks omitted).

The Court sees no reason to depart from *Sowell*'s and *Coffman*'s analyses. To the contrary, the Court believes that *Sowell* and *Coffman* control the present case. It is undisputed that Ames knew about Nationwide's internal processes allowing any employee to launch a complaint with the Human Resources department, the Office of Ethics, or the Office of Associate Relations. It is also undisputed that she did not do so. Rather, similar to the *Sowell* plaintiff, Ames only complained to Neel about not having immediate access to a lactation room, but did not avail herself of the established channels of communication within Nationwide. Dissatisfied with Neel's alleged indifference, Ames felt that she had no alternative but to resign.

Relying on *Sowell* and *Coffman*, the Court holds that Ames's claim of constructive discharge must fail. Ames did not follow known internal grievance procedures to lodge her complaint. Indeed, she did not even attempt to do so. Instead, she assumed the worst and surmised that her only reasonable option was to tender her resignation. Under existing law, Ames cannot prevail on her constructive discharge claim. Therefore, on this record, no

reasonable jury could conclude that Ames has presented sufficient evidence to establish the existence of a genuine issue of material fact precluding summary judgment for Defendants on her constructive discharge claim.

b.     *Inference of discrimination.*[40]

Ames argues that "a reasonable jury could find that the circumstances surrounding [Ames's] constructive discharge permit an inference of discrimination."  Pl.'s Resistance Br. at 30.  In support, Ames asserts that Neel's and Brinks's "barrage of comments . . . about her pregnancy and upcoming maternity leave" made it clear to her that her pregnancy was viewed as an inconvenience.  *Id.*  "[F]orcing [Ames] to come back to work earlier than she had expected" was yet another attempt "to get her to quit."  *Id.*  When Ames did not resign, Defendants made sure that she would "resign *the same morning she returned from maternity leave*."  *Id.* (emphasis in original).  For reasons that follow, the Court finds that Ames has not established the existence of circumstances surrounding her alleged constructive discharge, such that, when considered

---

[40]     "[T]he most straight-forward manner to give rise to an inference of sex discrimination" is for Ames to compare her treatment to that of other similarly-situated employees outside the protected class, or "comparators."  *See Lewis v. Heartland Inns of Am., L.L.C.*, 585 F. Supp. 2d 1046, 1064 (S.D. Iowa 2008), *rev'd on other grounds*, 591 F.3d 1033 (8th Cir. 2010).  In this case, such "comparators" would be men with children, not women without children.  *See Johnston v. U.S. Bank Nat'l Ass'n*, No. 08-CV-0296, 2009 U.S. Dist. LEXIS 79125, at *31, 32 n.13 (D. Minn. Sept. 2, 2009).  Since Ames has presented no evidence showing that Defendants treated her comparators more favorably, "the Court will appl[y] the slightly more expansive standard which allows [Ames] to meet the fourth prima facie element if she demonstrates that the [constructive] discharge occurred under circumstances giving rise to an inference of discrimination."  *See Lewis*, 585 F. Supp. 2d at 1063.

together or in isolation, they warrant an inference of discrimination. _____

         i.     *Alleged discrimination.*

The Court has already detailed and will not recount Defendants' alleged discriminatory comments and conduct. *See supra* § III.B.2.a.i.a. Rather, the Court finds it helpful to compare the facts of the present case to previous cases where the facts were found sufficient to support a discrimination claim.

In *Walsh v. Nat'l Computer Sys., Inc.*, 332 F.3d 1150, 1160 (8th Cir. 2003), the plaintiff sued her employer alleging gender discrimination on the basis of pregnancy. She claimed that she had been discriminated against "not because she was a new parent, but because she [was] a woman who had been pregnant [and] had taken a maternity leave."[41] *Id.* In concluding that there was ample support for the jury's finding that the plaintiff had been discriminated against on the basis of her pregnancy, the *Walsh* court relied primarily on the following factors: (1) the plaintiff was required to provide advance notice and documentation of her doctor's appointments while she was pregnant, and her co-workers did not have to do that, *see id.*; (2) the plaintiff was denied the opportunity to change her schedule by leaving at 4:30 p.m., instead of 5:00 p.m., so that she could pick up her son from daycare, even though some of her co-workers left work at 3:45 p.m., and her supervisor told her that she should probably look for another job, *see id.* at 1155; (3) the plaintiff's supervisor placed signs saying "Out—Sick Child" outside the plaintiff's cubicle

---

[41] Walsh also claimed that she had been discriminated against because she "might become pregnant again." *See Walsh*, 332 F.3d at 1160 (citing *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 680 (8th Cir. 1996) (holding that potential pregnancy was a sex-related medical condition)). Ames has not presented any evidence that she had been discriminated against because of her potential to become pregnant again. Accordingly, the Court will not examine this issue.

whenever she was caring for her sick son when such signs were not placed outside absent co-workers' cubicles, *see id.*; and (4) the plaintiff was required to make up "every minute" that she was absent due to doctor's appointments for herself or her son when no other employees were required to do so, *see id.*

Although the Court does not condone the discriminatory treatment that the *Walsh* plaintiff had to endure, it did not rise to the level of the disparate treatment accorded the plaintiff in *Snyder v. Yellow Transportation, Inc.*, 321 F. Supp. 2d 1127 (E.D. Mo. 2004). While on maternity leave, Snyder's employment as a sales representative was terminated as a part of an announced reduction in force. *See id.* The court denied the employer's summary judgment motion, holding that there was sufficient evidence in the record to support a finding that the plaintiff's "sex and recent pregnancy were factors considered in the decision to terminate her employment." *Id.* For instance, while she was on maternity leave, her employer permanently realigned the territory lines assigning Snyder to an undesirable territory. *See id.* Furthermore, one of Snyder's managers had made derogatory remarks about female sales representatives calling them "a pain in the ass." *See id.* Another manager had stated that male account managers were more capable than their female counterparts because women took time off to care for children. *See id.* at 1132. These comments, however, were not the most egregious conduct that Snyder's superiors engaged in. Following her discharge, one of her former managers asked a colleague of hers to fabricate a letter "for her file" outlining alleged customer complaints regarding Snyder's job performance. *See Snyder*, 321 F. Supp. 2d at 1132.

A "milder" case of pregnancy discrimination is *Vosdingh v. Qwest Dex, Inc.*, No. 03-4884, 2005 U.S. Dist. LEXIS 6866 (D. Minn. Apr. 21, 2005). Although the comments directed

at the plaintiff were not as harsh as those in *Snyder*, the court found that they were nevertheless sufficient to give rise to an inference of discrimination. *See Vosdingh*, 2005 U.S. Dist. LEXIS 6866, at *60. When Nicholls, one of the *Vosdingh* plaintiffs, informed her manager that she was pregnant for the second time, the manager asked her what she was going to do about her job. *See id.* at *59. The manager also added that it was hard to come back to work after having a child and that it was hard to keep "this job with two kids." *See id.* When Vosdingh returned to work and told her manager about her need to express milk, he made derogatory comments concerning her decision to come back to work and to continue breast-feeding. *See id.* The manager also told Vosdingh that he knew it was hard for her to come back to work and asked if there was any way she could stay home. *See id.*

The Court finds that *Dams v. City of Waverly*, No. C04-2077, 2006 U.S. Dist. LEXIS 19237 (N.D. Iowa Mar. 2, 2006) is also useful in deciding whether Ames has presented evidence sufficient to give rise to an inference of discrimination. After Dams became pregnant, she and her supervisor, Buls, had several discussions regarding the length of her upcoming FMLA leave. *See Dams*, 2006 U.S. Dist. LEXIS 19237, at *2. Buls took the position that eight, rather than ten, weeks of maternity leave would be more appropriate. *See id.* at *2–3. The court held that the inquiries as to the length of the leave and the statement that eight weeks of leave would be preferable were "perfectly appropriate." *See id.* at *14. Buls's "attempt[] to condition granting Dams'[s] unrelated vacation time on [her] taking only eight weeks of leave" was, however, inappropriate and illegal. *See id.*

The inquiry into whether a plaintiff has presented evidence sufficient to give rise to an inference of discrimination is case-specific. *See McDonnell Douglas*, 411 U.S. at 802 n.13 ("The

facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."). Thus, there are no particular comments or conduct that have to be present in a given case to permit an inference of discrimination. *See id.* With this in mind, the Court views *Walsh*'s, *Snyder*'s, *Vosdingh*'s, and *Dams*'s analyses as relevant and instructive, but in no way dispositive to the present case. After analyzing the record, the Court does not agree that the evidence in this case permits an inference of sex discrimination.

Assuming, *arguendo*, that Neel and Brinks made the comments at issue, the Court must still conclude that they are insufficient to warrant an inference of discrimination.[42] Unlike the employer's statements and actions in *Walsh*, *Snyder*, *Vosdingh*, and *Dams*, none of the comments or conduct at issue here indicates Defendants' negative attitude towards pregnancy or the likelihood that Ames would suffer an adverse employment action as a result of her pregnancy or maternity leave. Viewing the alleged discriminatory comments and conduct in the light most favorable to Ames, the Court finds that, at most, they are marginally inappropriate. They are not, however, indicative of Nationwide's negative attitude towards pregnancy, the feminine gender,

---

[42] The Court notes that all of the comments at issue occurred prior to Ames taking her maternity leave, which began on April 12, 2010. *See* Nationwide's App. at 88:17–93:23. Some of them were made when Ames was pregnant with her first child in 2008–09. *See id.* at 91:19–92:6. Considering the lack of temporal proximity between these comments and the alleged constructive discharge, the Court is less inclined to find a connection between the comments and the adverse employment action. *Cf. Quick v. Wal-Mart Stores, Inc.*, 441 F.3d 606, 610 (8th Cir. 2006) ("[W]e have been hesitant to find pretext or discrimination on temporal proximity alone." (internal citation and quotation marks omitted)); *Snelson v. Mo. Transp. Comm'n*, No. 06-4073, 2009 U.S. Dist. LEXIS 14456, at *13–14 (W.D. Mo. Feb. 24, 2009) ("[C]lose temporal proximity between an employer's discovery of a protected characteristic and an adverse employment action may, on rare occasions, suffice to create an inference of discrimination." (internal citation and quotation marks omitted)).

or maternity leave.

Notably, unlike in *Dams*, here there is no evidence that Nationwide attempted to discourage Ames from taking the entire FMLA leave to which she was entitled. To the contrary, she was actually given an extra week of maternity leave following the birth of her second child. It is also undisputed that Ames did not experience a disparate treatment resembling, even remotely, the one that the *Walsh* plaintiff had to endure. Unlike the *Snyder* plaintiff, Nationwide did not change the essential responsibilities of Ames's position while she was on maternity leave or upon her return to work. Most importantly, unlike the *Vosdingh* plaintiffs, Ames did not have to put up with any derogatory comments on account of her pregnancy, maternity leave, or desire to continue breast-feeding. Indeed, the evidence suggests that Defendants were quite accommodating and understanding of Ames's decisions to take all the FMLA leave to which she was entitled and to continue breast-feeding after coming back to work. Furthermore, Defendants did not, at any point, suggest or imply that Ames's pregnancies, maternity leave, or desire to continue breast-feeding somehow jeopardized her continued employment.

As with Neel's and Brinks's comments and conduct, the Court does not agree that the remaining instances of alleged discrimination by Hallberg and Baccam are sufficient to give rise to an inference of discrimination. Baccam's failure to advise Ames on the specifics of Nationwide's lactation policy does not constitute discriminatory conduct. Indeed, Ames has not presented any evidence that she informed Defendants of her plans to continue breast-feeding following her return to work. At the same time, Ames admits that the lactation policy was readily available to her on the company intranet and that she could have, but did not, ask Baccam any questions regarding the policy. In light of these circumstances, the Court cannot conclude

that Baccam engaged in any discriminatory behavior against Ames.

Similarly, the Court must conclude that Hallberg did not discriminate against Ames either. Providing a letter explaining the procedure for obtaining access to a lactation room is not an act of discrimination. When, on July 19, 2010, Ames found out that she would not be able to use a lactation room on that day, Hallberg offered her use of one of the wellness rooms instead. Hallberg also sent an email requesting that Ames's request for access to a lactation room be expedited. *See* Nationwide's App. at 152. The Court cannot agree that these actions exhibit any of the inherent characteristics of discriminatory behavior. To the contrary, Hallberg's actions portray her as someone who was exceptionally sensitive to Ames's recent childbirth and breast-feeding concerns.

ii.     *Revised return-to-work date.*

Based on the analysis in § III.B.2.a.i.b, the Court concludes that changing the end date of Ames's maternity leave does not give rise to an inference of discrimination. Although asking Ames to report back to work approximately two weeks earlier than she had expected came as a surprise, it did not prejudice her rights under the FMLA. To the contrary, Defendants allowed Ames to take an extra week of maternity leave over and above what she was entitled to under the law. This is not the type of conduct giving rise to an inference of discrimination.

iii.     *Events of July 19, 2010.*

The Court hereby incorporates by reference the analysis in §§ III.B.2.a.i.c and III.B.2.a.i.d. Ames asserts that, on July 19, 2010, two factors prompted her to believe that she had no choice but to resign—not being able to use a lactation room to express milk and her conversation with Brinks concerning the status of her work. With respect to the lactation room,

the Court notes that Ames was denied access *solely* due to her failure to fill out the required paperwork. While waiting for this paperwork to be processed, Ames was offered a wellness room where she could express breast milk. Neither the lack of lactation room access nor the need to use a wellness room to express milk belongs to the category of circumstances warranting an inference of discrimination, however. For that matter, neither does the July 19, 2010 conversation between Brinks and Ames.

During that meeting, Brinks communicated Nationwide's expectation that Ames must not fall behind on her work tasks and could use overtime if she needed it. The Court cannot agree that these were unreasonable expectations; to the contrary, timely completion of the work tasks was central to the loss mitigation specialist position. *See* Nationwide's App. at 48, p. 15:11–19. When asked about the importance of "stay[ing] on top of the work" in the Loss Mitigation Department, Brinks testified as follows:

> Q. And is that because that was a busy department?
> A. Yes.
> Q. And one where it was important to stay on top of the work?
> A. Yes.
> Q. Would you say that was probably a No. 1 priority for that department?
> A. It was a high priority.

*Id.* Furthermore, the record establishes that Ames was not treated differently than her co-workers in the Loss Mitigation Department. *See id.* "It was a high priority [that everyone] stay[ed] on top of the work." *Id.* at 48, p. 15:14–19. Even if Nationwide's expectations regarding Ames's timely completion of work tasks were unrealistic in light of her recent childbirth and three-month maternity leave, that alone does not give rise to an inference of discrimination. *See Standridge v. Union Pac. R.R. Co.*, 479 F.3d 936, 944 (8th Cir. 2007) ("While an employer must treat its

employees similarly, it does not have to treat employees in a protected class more favorably than other employees.").

## IV. CONCLUSION

For the reasons discussed above, Defendants' MSJ (Clerk's No. 46) is hereby GRANTED. In light of this ruling, the following motions are DENIED AS MOOT: (1) Motion for Summary Judgment (Clerk's No. 44); (2) Motion to Exclude Testimony of Plaintiff's Experts and Request for Oral Argument (Clerk's No. 31); (3) Motion to Strike (Clerk's No. 72); (4) Motion to Strike Section II of Defendants' Response to Plaintiff's Statement of Additional Material Facts (Clerk's No. 75); (5) Motion to Continue the Trial and Request for Expedited Ruling (Clerk's No. 85); and (6) Plaintiff's Motion in Limine (Clerk's No. 87). Additionally, for the reasons articulated in n.2 above, the Court DENIES Plaintiff's Motion for Hearing/Oral Argument (Clerk's No. 69).

IT IS SO ORDERED.

Dated this ___16th___ day of October, 2012.

_____

_____
ROBERT W. PRATT
U.S. DISTRICT JUDGE